[No. 64300-8. En Banc.]

Considered May 7, 1998. Decided October 1, 1998.

*In the Matter of the Personal Restraint of* BLAKE
PIRTLE.

470

*Finer & Pugsley*, by *Jeffry K. Finer*; *Charles S. Dorn*; and *Allen, Hansen & Maybrown, P.S.*, by *Todd Maybrown*, for petitioner.

*James R. Sweetser, Prosecuting Attorney for Spokane County*, and *Kevin M. Korsmo, Deputy*, for respondent.

Johnson, J. — Blake Pirtle, petitioner, was sentenced to death for the aggravated first degree murders of Tod Folsom and Dawnya Calbreath. We affirmed his conviction and sentence, and the United States Supreme Court denied his petition for a writ of certiorari. *State v. Pirtle*, 127 Wn.2d 628, 904 P.2d 245 (1995), *cert. denied*, 518 U.S. 1026, 116 S. Ct. 2568, 135 L. Ed. 2d 1084 (1996). Pirtle now presents this amended personal restraint petition (PRP),[1] rais-

---

[1]Pirtle's original PRP, his motion to dismiss and lift stay of execution, and his request for withdrawal of appellate counsel were denied on the merits by court order. We then granted Pirtle's motion for reconsideration of that order, appointed new counsel, and granted 90 days to file the amended PRP. The State has filed a motion asserting the one-year statute of limitations, RCW 10.73.090, requires 9 of the 14 issues to be stricken from Pirtle's amended PRP. The State's

ing new issues and renewing several issues addressed and rejected on direct appeal. We deny petitioner's personal restraint petition.

## FACTS

The facts of the crimes and the evidence presented in this case are fully recounted in *State v. Pirtle*, 127 Wn.2d 628 and will not be revisited except as is necessary to resolve the arguments presented in this personal restraint petition.

## ISSUES

(1) Was Pirtle's counsel ineffective due to a conflict of interest?

(2) Did the prosecutor fail to disclose impeaching evidence?

(3) Did Darin Wheeler seek incriminating information from Pirtle after Wheeler met with police?

(4) Did the prosecutor commit misconduct when he asked Pirtle's sister whether she killed anybody after she was "coming down" from drugs?

(5) Did the trial court violate Pirtle's constitutional rights by excluding him from various in-chambers conferences?

(6) Did the prosecutor improperly fail to disclose Pirtle's one-sentence statement to Deputy Walker during Pirtle's arrest?

(7) Was Pirtle denied effective legal representation during the trial's guilt phase?

(8) Was Pirtle denied effective legal representation during the trial's penalty phase?

(9) Was Pirtle denied effective legal representation during his appeal?

(10) Did the trial court err by failing to call a mistrial following alleged jury misconduct?

---

argument is not well taken. The State is fully aware of the unusual circumstances involved in this case and this court's granting of Pirtle's motion for reconsideration and appointment of new counsel. We will not revisit that decision and the State's motion is denied.

(11) Did the trial court err in allowing family members to sit too close to the jury?

(12) Did an accumulation of errors violate Pirtle's constitutional rights?

(13) Is execution by hanging cruel and unusual punishment?

(14) Is execution by lethal injection cruel and unusual punishment?

## ANALYSIS
### Standard of Review

 To obtain relief through a PRP, a petitioner must show he or she was actually and substantially prejudiced by a violation of his or her constitutional rights or by a fundamental error of law. *In re Personal Restraint of Cook*, 114 Wn.2d 802, 810, 792 P.2d 506 (1990); *In re Personal Restraint of Lord*, 123 Wn.2d 296, 303, 868 P.2d 835 (1994). If the petitioner makes a prima facie showing of error, but the issue cannot be resolved on the existing record, the case must be transferred to the superior court for an evidentiary hearing. RAP 16.11(b). An evidentiary hearing will be ordered only if the petitioner demonstrates he or she has competent, admissible evidence establishing facts which would require relief. *In re Personal Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). The petitioner may not renew an issue which was raised and rejected on direct appeal unless the interests of justice require the issue be reexamined. *Lord*, 123 Wn.2d at 303.

To the extent the materials listed by the State are hearsay and incompetent evidence, the motion is granted.[2]

---

[2] The State asserts the hearsay which should be excluded includes the following specific documents: (1) the declaration of Hays, Johnson, and Egland in their entirety; (2) the Maybrown declaration at ¶¶ 16, 19 and 25, wherein statements taken from police reports are used to attempt to prove the truth of the matters asserted therein; (3) the Rodgers declaration at ¶¶ 29, 31, 33-34 and the Westerman declaration at ¶¶ 44-47, 50-51 for the same reasons; (4) John Rodgers' notes (appended to the Maybrown, Rodgers, and Westerman declarations) from the Wheeler interview; and (5) appendix N to the Maybrown declaration (Flagenheimer report) which contains hearsay statements throughout, as well as newspaper

474

## Issue 1: Was Pirtle's Counsel Ineffective Due to a Conflict of Interest?

Pirtle claims his Sixth Amendment right to effective assistance of counsel, his Eighth Amendment right to a reliable penalty hearing, and his Fourteenth Amendment right to due process of the law were violated because he asserts his trial counsel also represented three of the State's primary witnesses in separate matters. Pirtle maintains his attorneys were working under a conflict of interest because three of the State's trial witnesses, Shawn Botner, Craig Ladwig and Darin Wheeler, were previously represented (and one allegedly at the time of trial) by other members of the Spokane Public Defender's Office.

Pirtle contends this conflict of interest resulted in the denial of effective assistance of counsel in several ways. First, the conflict impaired trial counsel's ability to conduct an appropriate investigation. Second, the conflict impaired counsel's ability to prepare for the cross-examination of these State witnesses. Third, the conflict ultimately resulted in counsel's deficient performance at the guilt phase and penalty phase of Pirtle's trial.[3] As noted above, the testimony of the State's witnesses, particularly Botner and Wheeler, entails the central claims of Pirtle's PRP.

 In dealing with issues involving ineffective assistance of counsel arising from divided loyalty, a petitioner must establish he or she was prejudiced: "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " *Strickland v. Washington*, 466 U.S. 668, 692, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (quoting

_____

articles. Also, in addition to being stricken as hearsay, the State argues the Egland and Hays declarations are not competent evidence and should be stricken on that basis as well. Resp't's Mot. to Strike Hearsay and Incompetent Evidence at 3-4.

[3]Pirtle claims his attorneys were ineffective in a number of additional respects, which are raised elsewhere in this opinion. *See* issues 7 and 8.

*Cuyler v. Sullivan*, 446 U.S. 335, 348, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)). An "actual" conflict of interest arises if the attorney's duties to another materially limit the representation of his client.[4] *State v. White*, 80 Wn. App. 406, 411-12, 907 P.2d 310 (1995) (citing *State v. Byrd*, 30 Wn. App. 794, 798, 638 P.2d 601 (1981)).

A. *Shawn Botner and Craig Ladwig*. In the guilt phase of Pirtle's trial, the potential for a conflict of interest did not go unaddressed. After being informed that the State would call two jailhouse informants, Botner and Ladwig, from the Spokane County jail, Pirtle's attorney, Donald Westerman, informed Pirtle of this fact. Shortly thereafter, on January 15, 1993, the court held a hearing for Pirtle to waive his speedy trial rights. During the course of that hearing, Westerman notified the court that the State may have listed two witnesses, Botner and Ladwig, previously represented in unrelated matters by the Spokane Public Defender's Office. Westerman stated he had never represented these witnesses and had no knowledge of their background. He also stated he felt there was no conflict of interest.

The trial court conducted a colloquy with Pirtle, where he was informed that certain persons on the State's witness list may have been clients of the Spokane Public Defender's Office. The court asked Pirtle if, knowing the potential ramifications of having these witnesses testify, "do you wish to continue with the Public Defender's Office and Mr. Westerman's representation?" Hr'g at 7-8 (Jan. 15, 1993). In response, Pirtle said, "[y]es I do. I'm very

---

[4]Rule of Professional Conduct 1.7(b) provides: "(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

"(1) The lawyer reasonably believes the representation will not be adversely affected; and

"(2) The client consents in writing after consultation and a full disclosure of the material facts (following authorization from the other client to make such a disclosure). When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."

pleased with my lawyer, and I—I mean, we [have] been waitin' eight months now to get discovery and everything. I don't want to spend another eight months with a new lawyer." *Id.* at 7-8.

Thus, Pirtle agreed to continue with his counsel after being expressly advised that the Spokane Public Defender's Office, but neither of his personal attorneys, had represented certain prosecution witnesses. There is no other evidence supporting Pirtle's allegations that his appointed counsel's allegiance to him was impaired. To the contrary, Pirtle's counsel stated he did not think there was a conflict. *Id.* at 4-7. Pirtle has not established that the alleged conflict of interest adversely affected appointed counsel's performance.[5] *See Strickland,* 466 U.S. at 692.

B. *Darin Wheeler.* Pirtle argues his waiver was inadequate because a conflict still existed between Pirtle's attorneys and witness Wheeler. Pirtle argues the trial court's January 15, 1993 colloquy neglected to provide Pirtle with any notice "of the hazards of having an attorney with divided loyalties represent him" because Wheeler allegedly sought a deal, with the assistance of attorney George Caplan from the Spokane Public Defender's Office, in exchange for his testimony against Pirtle. Br. in Supp. of First Am. PRP (Pirtle Brief) at 42.

Spokane police spoke with Wheeler about the Pirtle case while Wheeler served time with Pirtle at the Spokane County jail for unrelated crimes. The police report discussing this meeting between Wheeler and the Spokane Police Department stated that Wheeler wanted to talk to attorney Caplan from the Spokane Public Defender's Office about cutting a deal. Pirtle maintains Wheeler then contacted Caplan in order to make a deal. Pirtle argues an actual conflict of interest existed because Caplan would have worked with Wheeler on the same case as Pirtle's appointed trial counsel.

---

[5]The impact of Botner's testimony on the representation by Pirtle's trial counsel is further examined in issue 7.

Pirtle's argument, however, is based solely on speculation about what might have happened. The record does not support his contention. There is no evidence that Wheeler followed through on his statement that he wanted to make a deal. After his meeting with the police, Wheeler returned to jail, served the remainder of his sentence, and was released. In fact, Detective Rick Grabenstein, who initially met with Wheeler on October 18, 1992, signed a certificate where he stated Wheeler "was promised nothing in return for his testimony." Resp't's Apps., app. D (Certificate of Rick Grabenstein at ¶ 15). Detective Grabenstein also stated the following concerning the subsequent interview he had with Wheeler, which transpired after Wheeler was released: "The subject of a 'deal' of any benefit in exchange for talking to me or for testifying never came up. I believe that he had made that comment in October in order to avoid or delay talking to us." *Id.* at ¶ 11. Pirtle has not established that an actual conflict existed which in any way affected counsel's performance.[6]

### Issue 2: Did the Prosecutor Fail to Disclose Impeaching Evidence?

In every criminal trial, the State faces the well-established discovery obligation to turn over to the defense evidence in its possession or knowledge both favorable to the defendant and material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *United States v. Bagley*, 473 U.S. 667, 674, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987); *In re Personal Restraint of Rice*, 118 Wn.2d 876, 828 P.2d 1086 (1992). Therefore, the State must disclose any favorable treatment accorded witnesses for their testimony and may not permit a false view of that treatment to go before the

---

[6]Pirtle's additional claims concerning alleged *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964) violations and ineffective assistance of counsel claims related to Wheeler's testimony are discussed in issues 3 and 7.

jury. *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

■ Pirtle claims there were undisclosed inducements to former jail inmates Shawn Botner and Darin Wheeler. Pirtle presents no persuasive or competent evidence to support this claim and, even if such evidence were shown, his own testimony confirms much of Botner's and Wheeler's testimony. Any claimed error would, therefore, be harmless. For example, Pirtle testified, as did Botner, to the "Joe letters" scheme. Pirtle also confirmed Wheeler's testimony concerning Pirtle's description to him of what happened inside the Spokane Burger King. Although Wheeler disclosed Pirtle's statement to the effect that skin was harder to saw through than he had expected, Pirtle acknowledges, through testimony, that he may well have made that statement.

A. *Shawn Botner.* When asked at trial if anything had been promised in exchange for his testimony, Botner told the prosecutor the "cops said they'd help me get into [a] different prison when I was out." When asked if there was "anything else," he answered "no." Report of Proceedings (RP) at 1970. Relying on a declaration signed by Botner after the trial, Pirtle now claims Botner's testimony was perjured and knowingly presented by the prosecutor.

In the declaration relied upon by Pirtle, Botner states that police "detectives told me that they would not charge me with any additional crimes [for writing the 'Joe' letters] so long as I agreed to talk to them about Blake Pirtle." Botner Decl. at ¶ 2. This declaration further states the police "have followed through on their promise and have not prosecuted me for my involvement with Blake Pirtle and the letters." *Id.* at ¶ 4.

While at first glance this is troubling evidence, Botner later signed a certificate wherein he stated the following:

I was not threatened by the Detectives during the interview in Shelton, Washington during October, 1992. The Detectives

told me there could be possible charges but they also told me they did not want to charge me with anything. They did not tell me I would serve more time if I did not talk to them.

. . . .

I should have taken more time to understand the document when I signed the declaration sent to me by a woman working for Mr. Pirtle. Although the declaration used the word 'promise,' I was not promised anything. I thought it was another way of saying I was never charged with a crime.

Botner Certificate at 1. In light of Botner's new certificate, Pirtle has not established Botner's testimony was perjured and knowingly presented by the prosecutor. In addition, much of Botner's testimony was confirmed by Pirtle at trial, and neither of Botner's declarations indicates his trial testimony was false.

B. *Darin Wheeler*. As noted earlier, Wheeler asked to make a "deal" when he initially met with police. The police report noted Wheeler's statement that he planned to talk with his counsel and contact the police to discuss a deal. Wheeler did not follow through on his statement. He returned to jail, served his time, and was released. In fact, the police spent considerable time locating Wheeler after his release from jail in order to serve him with a subpoena for Pirtle's trial.

To dispute these facts, Pirtle relies on ambiguous notes made by his trial counsel while interviewing Wheeler in February 1993. According to Pirtle, these notes state that Wheeler was threatened by police. Pirtle further speculates these notes demonstrate Wheeler must have cut a deal to avoid problems with community supervision. As correctly argued by the State in its motion to strike hearsay and incompetent evidence, these notes are hearsay and are not included as evidence in this PRP.

Moreover, various sworn declarations by police officers investigating this case, and the community corrections officer supervising Wheeler, state Wheeler was given no special treatment in exchange for his testimony at trial.

Based on this evidence, Pirtle has not shown there was an agreement, let alone an undisclosed agreement in violation of *Brady v. Maryland*, 373 U.S. 83.

### Issue 3: Did Darin Wheeler Seek Incriminating Information From Pirtle After Wheeler Met With Police?

On October 18, 1992, more than five months after Pirtle obtained counsel, police spoke with Darin Wheeler about the Pirtle case while Wheeler served time with Pirtle for unrelated crimes at the Spokane County jail. Three months later, on January 25, 1993, police prepared a report summarizing their interview with Wheeler. This report states: "Darin Wheeler took our business cards and indicated that he would like to take care of this as soon as possible. Thus, we should expect to hear from him and/or his attorney very soon. Wheeler was then returned to jail." Westerman Decl., app. F (quoting Report of Jan. 25, 1993 at 1-2). Pirtle claims that sending Wheeler back to the Spokane County jail with a message they would be willing to make a deal in return for information regarding Pirtle essentially invited Wheeler to interrogate Pirtle about the case. Thus, because the police should have known Wheeler would have further access to Pirtle while he was in jail, Pirtle argues police violated his Sixth Amendment right to counsel as recognized by *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).

The State, however, contends police first approached Wheeler in October 1992, *after* Wheeler's case had been settled. While police sought information, Wheeler refused to give it and indicated he would like to talk to his attorney about making a deal. Yet, Wheeler apparently never did approach his counsel about working with the police. To the contrary, Wheeler returned to jail to serve his sentence and, following his release, considerable time was required for police to locate Wheeler. Moreover, the information

Wheeler testified to at trial was obtained in the early summer of 1992, well before the police contacted him.[7]

Pirtle counters by arguing the information testified to by Wheeler was obtained after the October 1992 police interview. To support this claim, Pirtle offers his personal declaration that Wheeler "pumped" him for information after Wheeler met with the police in October 1992, coupled with Pirtle's attorney's declaration that police records indicate Wheeler had the opportunity in jail to talk to Pirtle after October 1992. In addition, Pirtle argues the three-month delay in filing the police report provides a "logical inference . . . that the police did not want to document their contact with Wheeler to ensure that Pirtle was not informed that Wheeler was interested in cutting a deal in exchange for testimony." Pirtle Reply Br. at 46.

■ Beyond this claim, no additional evidence is offered to support Pirtle's alleged *Massiah* violation theory. The allegations and evidence presented are insufficient and, without additional evidence, Pirtle has not substantiated a *Massiah* violation.

### Issue 4: Did the Prosecutor Commit Misconduct When He Asked Pirtle's Sister Whether She Killed Anybody After She was "Coming Down" from Drugs?

In this issue and issue six, Pirtle asserts prosecutorial error denied his right to a fair trial. Both of Pirtle's claims fail.

■ To prevail on a prosecutorial misconduct argument, "the defendant must establish both improper conduct by the prosecutor and prejudicial effect." *Pirtle*, 127 Wn.2d at 672 (citing *State v. Furman*, 122 Wn.2d 440, 455, 858 P.2d 1092 (1993)). "Prejudice is established only if there is a substantial likelihood the instances of misconduct affected

---

[7]The prosecutor expressly asked Wheeler to talk about "the spring and summer months of 1992." RP at 1845. Wheeler stated he first discussed this case with Pirtle in May 1992. Wheeler testified that a month later, Pirtle admitted the "Joe" story was false and that he had killed the victims. RP at 1845-51.

the jury's verdict." *Pirtle*, 127 Wn.2d at 672 (citing *State v. Evans*, 96 Wn.2d 1, 5, 633 P.2d 83 (1981)). In a PRP, the petitioner must show actual and substantial prejudice by a violation of his or her constitutional rights or by a fundamental error of law. *Cook*, 114 Wn.2d at 810; *Lord*, 123 Wn.2d at 303.

Pirtle's first claim of prosecutorial misconduct involves a question the prosecutor asked Pirtle's sister during cross-examination. Following testimony that Pirtle and his sister had been drinking and partying together the night before the two slayings, the prosecutor asked, "[a]fter you were coming down, Miss Pirtle, did you go out and kill anybody?" RP at 2037. Immediately following this question, a defense objection was sustained and a curative instruction was given.

Pirtle argues this question was so improper that "one juror has recently explained that he based his verdicts in this case on this one question." Pirtle Brief at 106. To support this contention, Pirtle relies on Investigator Rick Hays' declaration that juror Bingle, who was interviewed by Hays, "explained that this question 'brought everything home' for him and helped him to reach the verdict in this case." Pirtle Br. at 106.

■ The State, as part of its motion to strike hearsay and incompetent evidence, asks that this hearsay statement of Investigator Hays be stricken on two bases. First, the State contends this statement is incompetent evidence because "cases have long established that a jury's thought process cannot be probed post-trial since it inheres in the verdict." State's Resp. at 44 n.27 (citing *Gardner v. Malone*, 60 Wn.2d 836, 841-43, 376 P.2d 651, 379 P.2d 918 (1962)). Second, the juror in question filed a certificate stating that Pirtle's allegations on this point are false. Specifically, this juror stated:

I did describe the testimony of Davida Pirtle to Hays as 'the turning point' of the case; however, I stated that this was an indication of a point in time or 'milestone' in the trial, as opposed to a reference to the statement itself or its specific content.

. . . .

At no time was there any indication that jurors had engaged in improper conduct nor did we consider any evidence not received in the courtroom.

Respondent's Apps., app. O (Certificate of Karl Bingle). Even if we were to consider the evidence presented by Pirtle, the question asked by the prosecutor was argumentative and, since the trial court appropriately sustained the objection and struck the query, Pirtle does not show that his entire trial was made unfair by this question.

Pirtle's second claim asserting prosecutorial misconduct is addressed in issue six.

### Issue 5: Did the Trial Court Violate Pirtle's Constitutional Rights By Excluding Him From Various In-Chambers Conferences?

Pirtle asserts error by the trial court in engaging in various in-chambers conferences without Pirtle being present. This issue is controlled by well-settled law.

"The core of the constitutional right to be present is the right to be present when evidence is being presented." *Lord*, 123 Wn.2d at 306 (citing *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985) (per curiam)). A defendant has the right to be present at proceedings where his or her presence has a reasonably substantial relation " 'to the fulness of his opportunity to defend against the charge . . . .' " *Lord*, 123 Wn.2d at 306 (quoting *Gagnon*, 470 U.S. at 526) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674, 90 A.L.R. 575 (1934)).

We have previously held that a defendant "does not have a right to be present during in-chambers or bench conferences between the court and counsel on legal matters . . . ." *Lord*, 123 Wn.2d at 306. Thus, the fundamental issue here is whether the matters addressed outside Pirtle's presence were matters at which his presence was required.

With one exception, all of the proceedings in which Pirtle was absent involved either legal matters, such as the wording of jury instructions, or ministerial matters, such as jury sequestration. As such, Pirtle's presence was not required and any claim of error fails. The one issue in which Pirtle's presence may have been appropriate involved alleged juror misconduct. After the conference, however, Pirtle was apprised of this matter and the issue was heard on the record in Pirtle's presence soon after the issue of alleged misconduct became known. Accordingly, Pirtle has not established his constitutional rights were violated by his absence from various in-chambers conferences between court and counsel. *See Lord*, 123 Wn.2d at 306.

Lastly, Pirtle has filed a motion for evidentiary hearing and discovery for any factual allegations disputed by the State. The State disputes Pirtle's factual account involving unrecorded conferences. Pirtle asserts that various unrecorded conferences may have involved other factual issues necessitating his presence. The only evidence supporting this contention is a declaration from Pirtle's trial attorney, stating, "[i]t is very possible, perhaps likely, that other factual and legal matters were discussed during the enumerated 'off the record' conferences." Westerman Decl. at ¶ 11. "In contrast, both trial prosecutors insist that the issue was never raised in chambers." State's Response at 48. Thus, since Pirtle has not demonstrated he has competent, admissible evidence establishing facts which would entitle him to an evidentiary hearing on this issue, his request is denied. *See Rice*, 118 Wn.2d at 886.

## Issue 6: Did the Prosecutor Improperly Fail to Disclose Pirtle's One-Sentence Statement to Deputy Walker During Pirtle's Arrest?

As in issue four, Pirtle again argues prosecutorial misconduct requires a new trial. However, "[t]o prevail on this argument, the defendant must establish both improper conduct by the prosecutor and prejudicial effect." *Pirtle*, 127 Wn.2d at 672 (citing *Furman*, 122 Wn.2d at 455). And, this conduct must constitute actual and substantial prejudice resulting in a violation of petitioner's constitutional rights or a fundamental error of law. *Cook*, 114 Wn.2d at 810; *Lord*, 123 Wn.2d at 303.

At the core of Pirtle's argument on this issue is a one-sentence statement by prosecution witness, Deputy Walker, given during direct examination. In his testimony, Deputy Walker stated that, immediately after placing Pirtle into custody, he asked Pirtle if he knew why he was under arrest. Pirtle responded by saying, "Of course I do, you might as well shoot me now." RP at 2607.

First, Pirtle contends the State violated Washington's criminal discovery rules which require the prosecuting attorney to disclose to the defendant "any written or recorded statements and the substance of any oral statements made by the defendant . . . ." CrR 4.7(a)(1)(ii). However, Pirtle ignores the fact that the police report did not mention any statement made by Pirtle and it was not in the State's possession. In fact, Deputy Walker supplied a certificate, acknowledging this statement was not in his report because he recalled it only while testifying. Moreover, the prosecutor's question to Walker, at best, was merely a general statement asking Walker to describe Pirtle's "unusual" behavior. It was not a solicitation of any specific statements. Based on these facts, the State did not violate CrR 4.7's discovery provision because Pirtle has not

established the State had knowledge that Deputy Walker's testimony would include Pirtle's one-sentence statement.

Second, Pirtle claims his due process rights were violated because the State failed to provide notice of the alleged statement and, thus, the trial court was neither able to hold an admissibility hearing under CrR 3.5 nor evaluate the prejudicial impact of this statement under ER 403. Again, Pirtle ignores the fact that the State had no knowledge Deputy Walker would mention this previously unknown statement in his testimony. No error by the State has been established.

 Third, Pirtle contends his due process rights were violated because the State introduced an involuntary, non-*Miranda* statement. The key question to Pirtle's claim is whether or not he was being interrogated. If he was being interrogated by Deputy Walker upon his arrest, Pirtle argues the statement would have been excluded under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966). However, Deputy Walker asked Pirtle if he knew why he was being arrested, which occurred at the time of the arrest. The expected response to Deputy Walker's question was likely "yes" or "no" and falls into the background questioning category under which *Miranda* warnings are not applicable. *See State v. Bradley*, 105 Wn.2d 898, 904, 719 P.2d 546 (1986); *State v. Walton*, 64 Wn. App. 410, 824 P.2d 533 (1992); *State v. Franklin*, 48 Wn. App. 61, 737 P.2d 1047 (1987).[8]

Finally, Pirtle asserts prejudice because the prosecutor misstated the evidence when he claimed Pirtle told the police, "Yeah, I know what I did." Pirtle Br. 139-41 (citing RP at 2786-87). While the prosecutor's rendition differs somewhat from the statement, "Of course I do, you might as

---

[8]In *Franklin*, the Court of Appeals concluded an officer's question as to whether an inmate awaiting extradition "understood what he had been charged with in Washington" was not designed to elicit an incriminating response and did not constitute an interrogation even though the inmate responded by saying he was surprised he was being charged with murder since he had committed only robbery. *Franklin*, 48 Wn. App. at 62-65.

well shoot me now" (RP at 2607), the prosecutor's comments, which are not evidence, did not prejudice Pirtle.

Issue 7: Was There Defective Legal Representation During the Trial's Guilt Phase?

 ██ Review of an ineffective assistance claim begins with a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. To prevail on this claim, Pirtle must show his attorneys were "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and their errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The first element is met by showing counsel's conduct fell below an objective standard of reasonableness. *Rice*, 118 Wn.2d at 888. The second element is met by showing that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the proceeding would have been different. *Rice*, 118 Wn.2d at 888.

Pirtle claims his trial counsel was ineffective during the guilt phase because his trial counsel (i) conducted an ineffective investigation; (ii) provided inadequate cross-examination of two prosecution witnesses; (iii) failed to object to inadmissible opinion testimony; (iv) opened the door to examining Botner about Pirtle's lack of remorse; (v) was ineffective in numerous "off the record conferences;" (vi) failed to provide a jury instruction on a diminished capacity defense; and (vii) was ineffective in handling Deputy Walker's testimony. Some of these issues have already been addressed in earlier claims.

A. *Ineffective Investigation.* Pirtle claims he was prejudiced because his trial counsel (1) did not interview a few police witnesses, (2) did not investigate alleged jailhouse informants, and (3) failed to review a police report that discussed the initial police meeting with jailhouse witness Wheeler. These claims fail.

 ██ First, Pirtle asserts his trial counsel was inef-

fective because counsel allegedly failed to interview the four investigating police officers, relying instead only on the police reports themselves. While having formal interviews with these witnesses may have been helpful, there is no absolute requirement that defense counsel interview witnesses before trial. This court has previously held that "the law must afford the attorney a wide latitude and flexibility in his choice of trial psychology and tactics. . . . [including], in some instances, whether to interview some witnesses before trial . . . ." *State v. Piche*, 71 Wn.2d 583, 590, 430 P.2d 522 (1967). Moreover, although there were no formal interviews, Pirtle's counsel spent considerable time reviewing evidence and obtaining answers to various questions with lead Detective Grabenstein and his assistant, Detective Henderson. There has been no showing that this approach was inadequate.

Second, Pirtle claims his trial counsel was ineffective because counsel failed to interview two alleged jailhouse informants, Botner and Wheeler. As noted earlier, a central theme to Pirtle's PRP is the assertion that secret inducements were given to these individuals in exchange for their trial testimony. Pirtle contends that interviewing these witnesses would have uncovered these alleged inducements, allowing for impeachment. However, as previously noted, there were no undisclosed inducements to either witness. The declarations of Detectives Grabenstein and Henderson support this fact. Thus, prejudicial error asserted by Pirtle is nonexistent.

Third, Pirtle asserts his counsel was ineffective because counsel neglected to review a police report which would have: (1) demonstrated defense counsel's alleged conflict of interest arising from the simultaneous representation by the Spokane Public Defender's Office of Pirtle and prosecution witness Wheeler, (2) demonstrated a *Massiah* violation, and (3) provided a "wealth of impeaching evidence." Pirtle Br. at 158-59. Yet, as previously noted in issues one and three, there was neither a conflict of interest nor a *Massiah* violation in this case and this claim fails.

■ B. *Inadequate Cross-Examination.* This claim, which overlaps Pirtle's "failure to impeach" claim, is that Pirtle's trial counsel violated Pirtle's Sixth Amendment right because counsel did a poor job in cross-examining Botner and Wheeler. However, even a lame cross-examination will seldom, if ever, amount to a Sixth Amendment violation. *Henderson v. Norris,* 118 F.3d 1283, 1287 (8th Cir. 1997), *cert. denied,* 118 S. Ct. 1081, 140 L. Ed. 2d 138 (1998). Pirtle has not shown or established by evidence that counsel's cross-examination was either ineffective or prejudicial.

■ C. *Inadmissible Opinion Testimony.* Pirtle asserts his trial counsel failed to object to damaging "opinion testimony" from Wheeler. Specifically, Pirtle contends that reversal is required because Wheeler was allowed to express his opinion that Pirtle could premeditate. Yet, issues involving premeditation were already examined on appeal. Moreover, even if there were an evidentiary error with Wheeler's opinion testimony, such an error does not constitute a "fundamental defect" amounting to a "miscarriage of justice" entitling Pirtle to relief, especially in light of Pirtle's own testimony. *Cook,* 114 Wn.2d at 811.

The evidence presented at trial established premeditation and motive. Pirtle, in addition to having motive for revenge for his termination from Burger King, chose to rob an establishment where he was well known and could be identified. Pirtle's actions that day, as illustrated by the following excerpt from his appeal, demonstrate premeditation.

> Pirtle took Dawnya into the walk-in cooler where he struck her several times in the head with two paint cans, then, after she was already unconscious and lying on the floor, he cut her throat. Both Pirtle's testimony and physical evidence show Dawnya resisted the attack.
>
> Pirtle then talked Tod into leaving the freezer and walking to the office, telling Tod he only wanted to knock him out. He convinced Tod to take off his glasses and lie face down on the

floor, whereupon he hit Tod twice with a fire extinguisher, then retrieved a knife and cut Tod's throat after he was unconscious. There were nine wounds to the front of Tod's neck and eight to the back of his neck, which could have been caused either by the knife or by a hacksaw found on Tod's body.

After killing Tod, Pirtle returned to the cooler and cut Dawnya's throat some more, as Pirtle testified, 'because her body was makin' noises.' He sawed at her throat with the knife at least sixteen times, nearly decapitating her. The examining physician speculated the hacksaw also may have been used on Dawnya's neck.

Following the murders, Pirtle had the presence of mind to change clothes, gather the robbery proceeds and some of the evidence into a garbage bag, bring his car to the rear of the Burger King, and load the full garbage bag into the car. He drove home, cleaned up the car and himself, and hid the evidence in a compost pile in a neighbor's yard. *The above facts, many of which are drawn from Pirtle's own testimony, are sufficient to establish premeditation.*

*Pirtle*, 127 Wn.2d at 645 (citation omitted) (emphasis added). Even assuming the failure to object was deficient by counsel, in view of the other evidence, Pirtle has not met the burden of establishing a fundamental defect.

D. *Opened the Door*. Pirtle contends his counsel was ineffective because counsel "opened the door" to examination of Botner about Pirtle's lack of remorse. This opportunity arose because Pirtle's trial counsel attempted to gain from Wheeler information that Pirtle had shown remorse when discussing the killings.

The efforts of Pirtle's counsel to show Pirtle was remorseful were certainly relevant because they had a direct bearing in showing whether Pirtle's ability to premeditate was "more probable or less probable." *See* ER 401. The attempt of Pirtle's trial counsel to have Botner testify Pirtle was remorseful only falls below an objective standard of reasonableness where, but for the alleged failure to meet an objective standard, there is a reasonable probability the proceeding's outcome would be different.

*Rice*, 118 Wn.2d at 888-89. No such showing has been made here.

E. *"Off the Record" Conferences*. Pirtle contends his trial counsel was ineffective in handling "off the record" conferences. He claims his counsel was ineffective because counsel failed to keep close track of all that transpired during these conferences, and never informed him he had a right to be present at these conferences. As earlier discussed, without additional information, Pirtle's argument fails.

To give any weight to Pirtle's argument requires accepting an unsupported assertion as true and then relying on this assumed fact to support the proposition that (1) Pirtle was absent from conferences involving legal matters, *Lord*, 123 Wn.2d at 306, and (2) his absence resulted in being actually and substantially prejudiced by a violation of his constitutional rights or by a fundamental error of law. *See Cook*, 114 Wn.2d at 810; *Lord*, 123 Wn.2d at 303. These conclusions do not follow. Pirtle's argument has not met the high burden required of him in this proceeding.

F. *Jury Instructions*. Pirtle charges his counsel was ineffective because counsel failed to provide a diminished capacity instruction. However, on appeal Pirtle already challenged the jury instructions in numerous ways.[9] "A personal restraint petition is not meant to be a forum for relitigation of issues already considered on direct appeal . . . ." *Lord*, 123 Wn.2d at 329. And, as noted, a petitioner cannot simply revise a previously rejected argument by alleging different facts or by asserting different legal theories. *Lord*, 123 Wn.2d at 329 (citing *In re Personal Restraint of Jeffries*, 114 Wn.2d 485, 488, 789 P.2d 731 (1990)). Thus, Pirtle's ineffective assistance of counsel claim based on allegations of improper jury instructions merely attempts to relitigate issues previously considered on direct appeal. We, therefore, decline Pirtle's invitation to revisit this issue.

---

[9]On direct appeal, Pirtle challenged the constitutionality of the antisympathy jury instruction and the jury instruction discussing mitigating circumstances, and claimed that the jury instructions and verdict were vague. *Pirtle*, 127 Wn.2d at 676-82.

G. *Deputy Cal Walker's Testimony*. Pirtle asserts his trial counsel was ineffective by failing to interview Deputy Walker because, if interviewed, Pirtle's counsel would have realized Deputy Walker planned to testify about Pirtle's incriminating one-sentence statement made during his arrest.[10] In response, Deputy Walker has supplied a certificate where he acknowledges he recalled Pirtle's statement only during his testimony. There are no facts to support the argument that interviewing Deputy Walker would have triggered his memory and made Pirtle's counsel aware of this evidence or, as previously discussed, established reversible error.

Pirtle also contends his trial counsel was ineffective because counsel failed to impeach Deputy Walker for not mentioning Pirtle's one-sentence statement in his police report. This claim is also unwarranted because, as noted in issue six, Pirtle has failed to meet the high burden required to show that the presentation of his one-sentence statement to Deputy Walker constituted prejudicial error. *See Pirtle*, 127 Wn.2d at 672; *Cook*, 114 Wn.2d at 810; *Lord*, 123 Wn.2d at 303. Any failure of Pirtle's counsel to impeach Deputy Walker does not fall below Sixth Amendment standards. *See Strickland*, 466 U.S. at 687.

## Issue 8: Was There Defective Legal Representation During the Trial's Penalty Phase?

Pirtle relies on three arguments in his contention there was defective legal representation during the penalty phase. Two of his arguments—defense counsel's failure to investigate and impeach the State's informants and defense counsel's improper jury instructions—are merely reassertions of errors alleged during the guilt phase. These issues, therefore, will not be reexamined.

---

[10]In his testimony, Deputy Walker stated that, immediately after placing Pirtle into custody, he asked Pirtle if he knew why he was under arrest. Pirtle responded by saying, "Of course I do, you might as well shoot me now." RP at 2607. (Various issues concerning this statement have already been thoroughly examined in issue six and are again discussed in issue nine.)

The one remaining argument not already examined is Pirtle's assertion that his counsel was ineffective by failing to introduce scientific studies about cocaine kindling. According to Pirtle, these studies would have shown "how persons with a kindled brain could fly into an explosive rage." Pirtle Br. at 193. This evidence was already before the jury. Defense counsel presented evidence of the alleged effects of cocaine kindling on Pirtle during the guilt phase. Dr. Lipman, who was the last defense witness, testified extensively about kindling and his belief that Pirtle was unable to premeditate the killing because his brain had been "kindled" by cocaine abuse. While the studies themselves concerning the effects of cocaine kindling were excluded, Dr. Lipman was permitted to refer to these studies to support his opinions about the impact cocaine abuse may have had on Pirtle. This evidence was before the jury in the penalty phase, and defense counsel relied on it in both the guilt and penalty phase closing arguments. Counsel used this testimony to highlight how drugs and mental illness had influenced Pirtle's actions.

██ ██ Pirtle's challenge to counsel's performance in the penalty phase fails on several grounds. First, as noted above, counsel presented expert testimony on diminished capacity and referred to that evidence in both the guilt and penalty phases. Second, although the studies excluded from the guilt phase provide a general clinical description of cocaine kindling, they do not deal specifically with Pirtle himself and were properly excluded by the trial court. The expert was able to refer to and rely on the studies even though they were excluded. And, the jury rejected the cocaine kindling theory in the guilt phase. For counsel to take a new approach to this issue in the penalty phase cannot be said to be ineffective.

██ ██ Finally, these studies are not "mitigating evidence."

'[M]itigating evidence' is not defined as any evidence, regardless of its content or relevance, that would disincline the jury to impose the penalty of death. Mitigating evidence is that

which 'in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability.' *State v. Bartholomew*, 101 Wn.2d 631, 647, 683 P.2d 1079 (1984) (*Bartholomew* II) (quoting BLACK'S LAW DICTIONARY 903 (5th rev. ed. 1979)).

*Pirtle*, 127 Wn.2d at 671. Descriptions of cocaine kindling do not constitute evidence sufficient to lessen Pirtle's moral culpability for the crimes he committed.

Accordingly, counsel's failure to reoffer these studies during the penalty phase is not sufficient to undermine confidence in the verdict or to establish his attorneys' failure to act as counsel as required by the Sixth Amendment. *See Strickland*, 466 U.S. at 689.

## Issue 9: Was There Defective Legal Representation During Pirtle's Appeal?

Pirtle claims his "appellate counsel's failure to ask this court to consider any issue regarding the testimony of Deputy Cal Walker violated [his] due process rights." Pirtle Br. at 197-98. As noted previously, Deputy Walker testified at trial that when Pirtle was asked during his arrest if he knew why he was being arrested, Pirtle replied "Of course I do, you might as well shoot me now." RP at 2607.

To avoid having this court conclude the failure of Pirtle's former appellate counsel to address Deputy Walker's testimony was merely a tactical decision to concentrate on more meritorious claims, Pirtle submits a declaration from his appellate counsel, Joan M. Fisher. In Fisher's declaration, she stated it "was a product of oversight" and not a strategic decision not to raise a claim pertaining to Deputy Walker's testimony. Pirtle Br. at 199 (citing Fisher Decl. at ¶¶ 9-10).

Pirtle contends that, but for his former appellate counsel's oversight, there is "a reasonable probability this court would have reversed his convictions and sentence, and remanded the case for a new guilt and penalty trial." Pirtle Br. at 201. We disagree, for the reasons discussed

in detail above. Pirtle offers no other evidence to show how Deputy Walker's statement meets his burden of proving prejudice.[11] Moreover, Pirtle argues that, due to his former appellate counsel's oversight, this court should review the prejudicial effect of Deputy Walker's statement under the same standard used on appeal. Thus, Pirtle contends the State should be required to show that any prejudicial effect of Deputy Walker's statement was harmless beyond a reasonable doubt. *See State v. Powell*, 126 Wn.2d 244, 893 P.2d 615 (1995).

Since we find no error in Deputy Walker's testimony, under any approach, Pirtle's argument fails.

### Issue 10: Did the Trial Court Err by Failing to Order a Mistrial Following Alleged Jury Misconduct?

Pirtle asserts the trial court erred in denying the defense motion for a mistrial based on juror misconduct. The trial court found this claim to be without merit. This issue was again raised and briefed on direct appeal, but withdrawn. There was no abuse of discretion.

### Issue 11: Did the Trial Court Err in Allowing Family Members To Sit Too Close to The Jury?

In the direct appeal, this court rejected Pirtle's argument that "the prosecutor impermissibly appealed to the jury's sympathy for the victims' relatives during the sentencing phase." *Pirtle*, 127 Wn.2d at 674. Specifically, we stated:

> While [the prosecutor's] reference to the victims' families might be characterized as an appeal to the jury's sympathy for the victims' relatives, we cannot conclude it swayed the jury in any way given the nature of the crimes involved, the vivid testimony and evidence received at trial, *and the fact that the victims' families sat in the first two rows of the gallery, in close proximity to the jury, throughout the trial.*

[11]Pirtle "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Pirtle*, 127 Wn.2d at 675 (emphasis added).

■ ■ Pirtle now argues his rights were violated because of the close proximity of the jury to the victims' families, who allegedly sat in the front row closest to the jury box. To support this claim, Pirtle offers hearsay testimony that one juror was allegedly overheard stating the presence of the victims' families in the courtroom was disturbing.

Pirtle's argument fails on several grounds. First, Pirtle has not shown, given the nature of the crimes involved and the vivid testimony and evidence received at trial, that the seating arrangements of the victims' families swayed the jury. *See Pirtle*, 127 Wn.2d at 675. Second, the only evidence offered by Pirtle is hearsay and cannot be used in support of an alleged constitutional violation. *Lord*, 123 Wn.2d at 313. Third, even if this hearsay evidence were considered, it refers to the presence of family members in the courtroom and not to the closeness of family members to the jury.

Finally, instead of again claiming the prosecutor improperly appealed to the jury's sympathy for the victims' families, Pirtle claims the prosecutor appealed to jury sympathy through the families' seating arrangements. The underlying claim is that the jury impermissibly felt sympathy for the victims' families. As noted previously, this issue was resolved on appeal. A petitioner cannot simply revise a previously rejected argument by alleging different facts or asserting different legal theories. *Lord*, 123 Wn.2d at 329 (citing *Jeffries*, 114 Wn.2d at 488).

## Issue 12: Did an Accumulation of Errors Violate Pirtle's Constitutional Rights?

■ Pirtle claims an accumulation of errors warrants reversal even if one of these alleged errors does not by itself show he was actually and substantially prejudiced by a violation of his constitutional rights or by a fundamental error of law. *See Cook*, 114 Wn.2d at 810; *Lord*, 123 Wn.2d at 303. Yet, claims, which alone are insufficient to grant ha-

beas relief, do not suddenly become meritorious by simply aggregating these claims into one claim. *See Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990). Beyond a general assertion of accumulated error, and since we have found no error, Pirtle has not established any error that accumulates to an error of such magnitude that resentencing or retrial is necessary. *See Lord*, 123 Wn.2d at 332.

### Issue 13: Is Execution by Hanging Cruel and Unusual Punishment?

Although Pirtle contends death by hanging constitutes cruel and unusual punishment, this argument has been rejected by this court. *State v. Frampton*, 95 Wn.2d 469, 512-14, 627 P.2d 922 (1981) (Stafford, J., concurring in part, dissenting in part); *Lord*, 123 Wn.2d at 325-26. And, most recently, and thoroughly, in *In re Personal Restraint of Benn*, 134 Wn.2d 868, 952 P.2d 116 (1998). The Ninth Circuit Court of Appeals has done the same. *Campbell v. Wood*, 18 F.3d 662, 674-75 (9th Cir. 1994). As no new arguments have been presented, we will not revisit this issue in this opinion.

### Issue 14: Is Execution by Lethal Injection Cruel and Unusual Punishment?

Pirtle also alleges on appeal that lethal injection as a manner of execution is unconstitutionally cruel and unusual punishment. Other jurisdictions have held that capital punishment by lethal injection is not cruel and unusual punishment. *Poland v. Stewart*, 151 F.3d 1014 (9th Cir. 1998); *Poland v. Stewart*, 117 F.3d 1094 (9th Cir. 1997); *People v. Holt*, 15 Cal. 4th 619, 937 P.2d 213, 63 Cal. Rptr. 2d 782 (1997); *Wools v. McCotter*, 798 F.2d 695 (5th Cir. 1986); *Ex Parte Granviel*, 561 S.W.2d 503 (Tex. Crim. App. 1978).

Pirtle carries the evidentiary burden to prove that the Washington State lethal injection protocol is cruel and unusual punishment. To meet this burden, Pirtle presents evidence entirely based on lethal injection methods in other states. Pirtle fails to analogize, with any precision, between

that evidence and Washington State's lethal injection protocol. As the Ninth Circuit Court of Appeals recognized for a similar claim, mere observations and speculations as evidence are insufficient to raise a genuine issue of material fact. *Poland*, 151 F.3d at 1023. Pirtle's claim on these grounds is therefore denied.

## CONCLUSION

Pirtle's amended PRP is denied.

DURHAM, C.J., and DOLLIVER, SMITH, GUY, MADSEN, ALEXANDER, TALMADGE, and SANDERS, JJ., concur.

After modification, further reconsideration denied December 7, 1998.