IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34002-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| EARL THOMAS CLAPPER, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. —Earl Clapper appeals his conviction for attempting to elude a

police vehicle, arguing that insufficient evidence supports his identity as the driver who

eluded police in a friend's car. He also contends his federal and state constitutional rights

were violated when the trial court convened a discussion about a jury inquiry with

lawyers outside his presence. Because the evidence was sufficient and Mr. Clapper fails

to demonstrate that he was not present or consulted when a response to the jury inquiry

was framed, we affirm.

FACTS AND PROCEDURAL BACKGROUND

At about 3:30 a.m. one morning in March 2015, Spokane Police Officer Paul

Gorman was driving home after his shift, heading north on Maple Street. Maple Street

and Ash Street, located a block to the west, comprise a couplet: Ash operates one-way

southbound; Maple Street operates one-way northbound. In the vicinity of Boone and

Maxwell streets, not far north and west of downtown, Officer Gorman saw a car driving the wrong way toward him. Preferring not to make a traffic stop, the officer flashed his lights, hoping the driver would realize it was a one-way street and turn around.

The driver immediately turned westbound and headed toward Ash, but his turn was into a dirt alley and he was traveling too fast given the alley's condition. Officer Gorman turned west on the next paved road and saw that the car had now turned north on Ash, once again driving the wrong way on a one-way street. At that point, the officer decided to follow the car, intending to make a stop. He activated his overhead lights and siren. The car sped up and a chase ensued. Officer Gorman radioed what was happening and requested assistance.

The eluding driver soon moved off of arterials and onto residential streets, continuing to travel at as much as 80 miles an hour. At that point, Officer Gorman decided for safety reasons to terminate the pursuit. Because eluding drivers sometimes respond to the termination of a pursuit by trying to hide or by parking and fleeing, Officer Gorman and other responding officers continued to search the area, driving at posted speeds with their emergency equipment off. Officer Gorman occasionally sighted the eluding car, which was driving with its lights off. When the car was seen entering the Corbin Park neighborhood, officers believed they had the driver contained; the neighborhood is backed by a hillside and egress is limited to three arterials that could easily be monitored.

It was not long before Officer Gorman spotted the errant car, pulled all the way up a long residential driveway. The driver had abandoned it. Officer Gorman had never been able to read the license plate number of the eluding vehicle but he recognized the car by its color (red), his estimation of its model (a newer car he believed to be a Toyota), and by extensive damage to its front end. The car proved to be a 2011 Toyota Corolla. The engine of the parked car was very hot and it smelled of burning oil, as one would expect of a car that had just been driven hard.

Officer Gorman happened to have a K-9 partner, Axel, who was headed home with him when the wrong-way driver was encountered. Officer Gorman took Axel to the driver's car door of the Toyota, gave him the command to track, and Axel began, leading the officer past a detached garage to a high concrete fence, suggesting that whoever fled the car had jumped the fence. To enter the adjacent yard, Officer Gorman took Axel around the front to enter through a gate. As he was entering the yard, Officer Gorman heard other officers giving commands to someone and saw that a man had emerged, hands up, from a yard a couple of homes away. While other officers detained and spoke with a man who turned out to be Earl Clapper, Officer Gorman had Axel finish tracking the driver's scent. Beginning at the opposite side of the concrete fence to which he had tracked earlier, Axel continued through two yards to where Mr. Clapper had surrendered.

In surrendering to other officers, Mr. Clapper stated "[I]t's me you're looking for, I give up, don't hurt me." Report of Proceedings (RP) at 96. He was ordered to get

3

down, complied, and was handcuffed. He was read his *Miranda*[1] rights, said he understood them, and volunteered that he had never been in any car and had never run from the officers. He also said that his backpack might be in the car, but he had not been.

After returning Axel to his patrol car, Officer Gorman approached Mr. Clapper and asked what he was doing in the area, to which Mr. Clapper responded he was staying at a nearby hotel, had been listening to a police scanner, and heard that police were chasing a car whose license plate number he recognized as that of his girlfriend, Tracy Varner. When Officer Gorman told Mr. Clapper he never called in the license plate number, Mr. Clapper corrected himself, saying he knew his girlfriend's car was red and was being driven around that evening, so he assumed the car being chased was hers. He said he had left his backpack in her car and had come to retrieve it.

One of the responding officers inspected the Toyota following the interview of Mr. Clapper. The officer had seen Mr. Clapper, knew he was a large man, and noticed that the Toyota's driver's seat was in its rear-most position and the seat was reclined all the way—suggesting to the officer that someone of large stature had been driving it.

Mr. Clapper was charged with attempt to elude a police vehicle. "[D]efendant information" included in the charging document indicated that Mr. Clapper was six feet, three inches tall and weighed 407 pounds. Clerk's Papers (CP) at 1.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

At trial, the State called Officer Gorman and two other Spokane police officers who had participated in Mr. Clapper's pursuit and arrest. Officer Gorman conceded he had never seen who was in the Toyota during the chase, but stated that upon viewing the vehicle in the driveway, including the engine's temperature and smell, it was "[v]ery obvious this was the car [he] was chasing." RP at 88. He testified to Axel's training and to how Axel had tracked a scent from the Toyota's driver's side door to where Mr. Clapper surrendered. The two other officers testified to Mr. Clapper's surrender that evening, the position of the driver's seat in the Toyota, the statements Mr. Clapper had made, and the fact that he was sweating profusely when encountered.

Ms. Varner was the only witness called by the defense. She testified that on the evening before the chase, she had a barbecue at her home and Mr. Clapper, whom she described as "a friend of a friend," attended. RP at 147. When she decided to go to bed, four or five guests remained, one being Mr. Clapper. None had a vehicle to leave in. She testified to making the following offer upon retiring:

> A. . . . I said if anyone feels like they can drive, I don't care if you take my car.
> Q. Did you make that offer specifically to Earl?
> A. No.
> Q. Did you make that offer at all to Earl?
> A. No.

RP at 151.

5

Ms. Varner also testified that she did not believe Mr. Clapper drove her car that night, but without explaining her reason for that belief. The implication of her testimony was that she believed Mr. Clapper was too large to drive her car. Defense counsel elicited Ms. Varner's testimony that her Toyota Corolla was a compact car that was "not made for big men." RP at 149. She was asked to describe the size of the guests who were offered her car the night of the chase, and she ascribed heights and weights to three of them that would make them materially smaller than Mr. Clapper. She testified that a fourth "lives, like, two blocks away, so she was walking home." RP at 151.

On the first morning of the jury's deliberations, it submitted five questions to the court.[2] The trial court's judicial assistant convened what the trial court later described as a "three-way conversation on the phone" addressing how to respond. RP at 196.

According to the court, all agreed that it was best to "respond that the jury was to rely upon the instructions they had been given, and their notes and memories as to the evidence." RP at 196. That was the substance of the court's response.

The jury found Mr. Clapper guilty as charged. He appeals.

---

[2] The jurors posed the following questions: "Was the driver's seat reclined? Was Clapper charged with [ ]reckless drivin[g] or DUI? Do we know the position of front passenger seat[?] Did police follow up on hotel [and] scanner[? and] Where does Clapper live[?]" CP at 18.

## ANALYSIS

Mr. Clapper assigns error to (1) his conviction on the basis of constitutionally insufficient evidence that he was the driver of the eluding car, and (2) the court's conduct of proceedings addressing the juror's questions outside his presence. He also asks the panel to decline to award appellate costs should the State substantially prevail. We address the three issues in turn.

### I. *The State presented sufficient evidence that Mr. Clapper was the driver of the eluding vehicle*

In criminal prosecutions the State "bears the burden of establishing beyond a reasonable doubt the identity of the accused as the person who committed the offense." *State v. Hill*, 83 Wn.2d 558, 560, 520 P.2d 618 (1974). As with all sufficiency challenges, "[t]he test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). In a sufficiency challenge, "all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* A defendant raising such a challenge "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Id.*

As the jury was informed by the court's instructions, "The law does not distinguish between direct and circumstantial evidence in terms of their weight or value

in finding the facts in this case. One is not necessarily more or less valuable than the other." RP at 164 (Instruction 7); *accord State v. Slert*, 186 Wn.2d 869, 879, 383 P.3d 466 (2016). We defer "to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Cordero*, 170 Wn. App. 351, 361, 284 P.3d 773 (2012).

In closing argument, Mr. Clapper's lawyer never challenged Officer Gorman's certitude that the driver who attempted to elude him was driving Ms. Varner's Toyota. Defense counsel argued, instead, that the State failed to prove beyond a reasonable doubt that the driver was not one of Ms. Varner's *other* guests, to whom the Toyota had been offered. On appeal, Mr. Clapper emphasizes evidence that Ms. Varner offered use of her car to several persons but not to him, that Officer Gorman could not see the car's occupant or occupants, and that about five minutes passed between when officers last saw the Toyota and when it was found parked in the driveway—yet officers failed to search for anyone else in the neighborhood after Mr. Clapper surrendered. Br. of Appellant at 5.

But all of the following evidence supports the jury's verdict: Mr. Clapper was one of the four or five individuals present when Ms. Varner made an unqualified offer of use of her car. He surrendered to police in close proximity to where the car was found parked and abandoned, initially telling officers "[I]t's me you're looking for" and later offering changing and implausible explanations for his presence. RP at 96. Axel tracked a scent from the driver's car door to where Mr. Clapper surrendered. Mr. Clapper was sweating

8

profusely when encountered by police, consistent with someone who had engaged in a chase, leapt a high fence, and tried to escape or hide. His backpack was in the car. Even Ms. Varner's implication that Mr. Clapper was too large to drive her Toyota was consistent with the unusual fully-back, fully-reclined position in which the driver's seat was found.

The State's evidence that Mr. Clapper was the driver was sufficient.

### II. *Mr. Clapper does not demonstrate that the telephone conference dealing with the jury's inquiry violated any constitutional right*

A criminal defendant enjoys a right to be present at critical proceedings, rooted in the Sixth Amendment to the United States Constitution; the due process clauses of the state and federal constitutions (U.S. CONST. amend. V; WASH. CONST. art. I, § 3); and article I, § 22 of our own constitution. *Slert*, 186 Wn.2d at 874. The core of the constitutional right is the right to be present when evidence is being presented, but beyond that the defendant has a right to be present at a proceeding "'whenever his presence has a relation, reasonably substantial, to the ful[l]ness of his opportunity to defend against the charge.'" *State v. Irby*, 170 Wn.2d 874, 881, 246 P.3d 796 (2011) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934), *overruled in part on other grounds sub nom. Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)).

9

The right to be present is not absolute. "[B]ecause the relationship between the defendant's presence and his 'opportunity to defend' must be 'reasonably substantial,' a defendant does not have a right to be present when his or her 'presence would be useless, or the benefit but a shadow.'" *Id.* (quoting *Snyder*, 291 U.S. at 106-07). Where the court and counsel address legal matters not requiring a resolution of disputed facts, it is well settled that a defendant has no right to be present. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 306, 868 P.2d 835 (1994), *aff'd*, 161 Wn.2d 276 (2007); *Irby*, 170 Wn.2d at 881. Nor does a defendant's right to be present extend to ministerial matters. *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 484, 965 P.2d 593 (1998).

The few cases that have addressed a defendant's constitutional right to be present when a trial court considers how to respond to a jury inquiry during deliberations have sometimes assumed that there is such a right, but have more recently turned on whether responding to the jury's question involved a purely legal issue. *Compare State v. Ratliff*, 121 Wn. App. 642, 646, 90 P.3d 79 (2004) (assuming a constitutional right), *with State v. Sublett*, 156 Wn. App. 160, 183, 231 P.3d 231 (2010), *aff'd*, 176 Wn.2d 58 (2012) (right to be present did not apply to "the purely legal issue of how to respond to the jury's request for a clarification in one of the trial court's instructions"). Requests for guidance from the court when jurors feel deadlocked have been treated as a critical stage with "much . . . at stake," and thereby one at which a defendant has a right to be present. *State v. Burdette*, 178 Wn. App. 183, 201, 313 P.3d 1235 (2013).

10

As the State points out, we need not determine whether the questions posed by Mr. Clapper's jury implicated his constitutional right to be present because he does not demonstrate that he was *not* present or consulted when the three-way conference took place following receipt of the jury's inquiry. On very similar facts, our Supreme Court held in *State v. Jasper*, 174 Wn.2d 96, 124, 271 P.3d 876 (2012), that the defendant failed to shoulder his burden to demonstrate a violation of his constitutional right to be present. The record in *Jasper* revealed that the defendant was out of custody during jury deliberations and therefore might have been present or been contacted when the trial court conferred with counsel. The court cited the principle that on a partial or incomplete record, appellate courts will presume a conceivable state of facts consistent with the record that will "'sustain and support the ruling or decision complained of'" rather than presume facts "'for the purpose of finding reversible error.'" *Id.* at 123-24 (quoting *Barker v. Weeks*, 182 Wash. 384, 391, 47 P.2d 1 (1935).

Here, as in *Jasper*, the record reveals that Mr. Clapper was not in custody. It reveals that closing arguments were completed near the end of the day, following a short trial. Jury deliberations either began, or began in earnest, the following morning, and by 12:10 p.m., the parties had returned to court to hear the jury's verdict. It was after the trial court accepted the unanimous verdict and excused the jury that it made its record about the handling of the jury's inquiry. Its record establishes that the jury's inquiry had been received at around 9:40 a.m. that morning, that the judicial assistant had convened

11

the three-way conference call, and that the court had responded to the jury in the manner agreed during the call. After making the record, the court stated, "I don't know if either counsel wish to comment on that. You certainly are welcome to if there is anything you want to say about it." RP at 197. No one commented. It is entirely conceivable that Mr. Clapper was awaiting the jury's verdict at his lawyer's office or subject to immediate contact, and was able to sit in on the call or be consulted. That no one commented when invited to do so by the court further suggests that the defendant was not excluded.[3] Assuming Mr. Clapper had a constitutional right to be present, he fails to demonstrate a violation.

We also conclude that any error would be harmless beyond a reasonable doubt. "Generally, where the trial court's response to a jury inquiry is 'negative in nature and conveys no affirmative information,' no prejudice results and the error is harmless." *State v. Jasper*, 158 Wn. App. 518, 541, 245 P.3d 228 (2010), *aff'd*, 174 Wn.2d 96 (2012) (quoting *State v. Russell*, 25 Wn. App. 933, 948, 611 P.2d 1320 (1980)). A court's communication with the jury is negative in nature—or neutral—when it "simply [refers] the jury back to the previous instructions." *State v. Langdon*, 42 Wn. App. 715, 717-18,

---

[3] In *Slert*, filed after the parties completed their briefing, our Supreme Court held that a violation of a defendant's right to be present is waived if the defendant himself learns of the violation before it is too late to object, yet fails to object. 186 Wn.2d at 875-76. Here, the record's silence as to *when* Mr. Clapper learned of the three-way conference operates in his favor. If he did not learn until after the jury's verdict was accepted and the jury was excused, his opportunity to object came too late.

12

713 P.2d 120 (1986). Mr. Clapper suggests that had he been present, he would have asked the court to specifically direct the jury to its instruction on the State's burden of proof, thereby reminding jurors of their duty "to hold any evidentiary shortcoming against the State." Br. of Appellant at 11. The trial court's response directing the jurors to "[p]lease review your instructions as to the law" did that, without emphasizing the burden of proof instruction to the exclusion of others in a way that could be viewed as a comment on the evidence. CP at 18.

### III. Appellate costs

Mr. Clapper asks in his brief that we waive costs on appeal if he does not prevail, claiming he is currently indigent and will unlikely be able to pay in the future. "RAP 14.2 affords the appellate court latitude in determining if costs should be allowed." *State v. Nolan*, 141 Wn.2d 620, 626, 8 P.3d 300 (2000). By general order, this court has created a procedure by which appellants may provide a panel with evidence and argument on the basis of which the panel can exercise informed discretion whether to deny costs. *See* Gen. Order of Division III, *In re the Matter of Court Administration Order re: Request to Deny Cost Award* (Wash. Ct. App. June 10, 2016).

Mr. Clapper has not complied with our general order. We therefore decline to consider his request. The denial is without prejudice to his right to demonstrate his current or likely future inability to pay such costs to our commissioner. *See* RAP 14.2.

13

No. 34002-3-III
*State v. Clapper*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Lawrence-Berrey, J.

14