IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37153-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH TERRY HARPER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Joseph Harper received a life without parole sentence under the

Persistent Offender Accountability Act (POAA)[1] after being convicted below of first

degree assault, among other crimes. We stayed the appeal pending the Washington

Supreme Court's decision on whether legislation enacted in 2019 that removed second

degree robbery from the list of "most serious offenses" meant that Mr. Harper's prior

conviction of that crime could not be relied on to support his POAA sentence.

We lifted the stay after the Supreme Court ruled that the 2019 legislation cannot

be relied on by offenders like Mr. Harper. (At about the same time, the legislature

afforded him a statutory remedy.) We address his remaining assignments of error and,

finding no error or abuse of discretion, affirm.

---

[1] RCW 9.94A.030(38)(a), .570.

FACTS AND PROCEDURAL BACKGROUND

Late one evening in early November 2017, Joseph Harper went on a destructive spree fueled by methamphetamine and, the State would later argue, by the breakup of his marriage. It was presaged four to five hours earlier, when he drove erratically, screaming and yelling, through the parking lot of an apartment complex where his estranged wife, Chelsea Harper, was living. She and her roommate told him to leave and he apparently complied.

Chelsea Harper later drove to the Dairy Queen, where she worked, and parked her 1993 Chevrolet Camaro in the back of its parking lot.

At around 10:00 p.m., Spokane Police Officer Jeremy McVay was on patrol when he saw Mr. Harper on the median of the road fronting the Dairy Queen, trying to flag him down. He stopped and spoke to Mr. Harper, who was sweating heavily and spoke fast and frantically. In a convoluted narrative, Mr. Harper expressed concern about the safety of his wife, who was working inside. Mr. Harper's behavior suggested to the officer that he was under the influence of a stimulant—either cocaine or methamphetamine.

After speaking with Mr. Harper for about 10 minutes, Officer McVay went into the Dairy Queen to check on Ms. Harper. Officer David Betts, who had been dispatched to assist Officer McVay, stayed with Mr. Harper. Officer Betts agreed that Mr. Harper appeared to be high on methamphetamine, and was told by Mr. Harper that he had ingested some. Officer McVay spoke with Chelsea Harper, who was finishing up her

work shift. He returned to Mr. Harper to assure him that Ms. Harper was not in any danger. Mr. Harper left.

Mr. Harper soon returned, entered the Dairy Queen, and told one of Ms. Harper's coworkers that he needed to speak to her. Ms. Harper saw that he was in the lobby and walked to the back of the building. Her night manager told Ms. Harper that he would take care of it and told Mr. Harper to leave.

The restaurant closed at 10:00 p.m., and as Ms. Harper was doing dishes and washing her grill, she heard coworkers questioning what some guy was doing in his car out front. It turned out to be Mr. Harper. He knew that Ms. Harper's Camaro's damaged ignition could be started without a key and that she was unable to lock the car, and he had located it in the parking lot. When Ms. Harper walked up front to see what was going on, she saw that it was her car, "do[ing] donuts in the parking lot and peel[ing] around very fast." Report of Proceedings (Feb. 1, 2019) (RP) at 463. When the car stopped, Mr. Harper got out, approached the building, and pounded on the windows, yelling at Ms. Harper to come out and talk to him.

When Ms. Harper remained inside, Mr. Harper got back in her car and left. Different witnesses observed later events from different vantage points, and their accounts are not entirely consistent. They are in agreement that Mr. Harper drove the Camaro back and forth, through the Dairy Queen parking lot and the parking lot of J&K Gas located across the street, driving it into several vehicles.

3

Kelly Krebs had the misfortune of driving up to J&K Gas at one point when Mr. Harper suddenly backed out of the Dairy Queen parking lot, and Mr. Krebs had to brake hard to avoid a collision. He honked, and as he drove around the Camaro, looked at Mr. Harper and raised his arms. He then pulled up to a gas pump at J&K and went inside to prepay for his gas. When he emerged, he saw Mr. Harper parked in the lot, yelling at a bicyclist for no apparent reason. When Mr. Harper saw Mr. Krebs, he put the Camaro in reverse and begin backing toward Mr. Krebs's car, alternately revving the engine and hitting the brakes. Mr. Krebs yelled, "[W]hat are you doing, don't hit my car!," but Mr. Harper moved the Camaro to within a couple of feet of the front of Mr. Krebs's car and then backed into it. RP at 555. At that point, Mr. Krebs pulled a stun gun from his car and sparked it at Mr. Harper. Mr. Harper drove off.

As Mr. Krebs fueled his car, he heard crashing sounds from the Dairy Queen across the street. He saw Mr. Harper strike two cars in Dairy Queen lot with the Camaro. Leaving his car behind, Mr. Krebs walked to the Dairy Queen lot, video recording what was happening with his cell phone. When Mr. Krebs reached the Dairy Queen lot, Mr. Harper accelerated directly toward him three times and each time Mr. Krebs got out of the way. Mr. Harper then drove back to the J&K lot and sideswiped Mr. Krebs's less agile car with the Camaro.

Either before or after sideswiping Mr. Krebs's car, Mr. Harper, while in the Dairy Queen parking lot, crashed the Camaro into the restaurant's entry. Ms. Harper was

4

standing in the lobby, about 10 feet from the front doors; she was afraid her husband was going to speed up and actually enter the building. The restaurant manager, Tiffany Glick was also watching; according to her, it was only because Mr. Harper struck a garbage can that he did not break through the double doors.

Police received multiple calls during the melee. According to Ms. Glick, they arrived after Mr. Harper had done a couple of "loops" on the street at high speed and had come to a stop on the median. RP at 509-10. Ms. Glick saw Mr. Harper put his hands out the driver's door window after police arrived. But when an officer grabbed his arm, Mr. Harper accelerated away.

The officer Ms. Glick saw approach the Camaro was Sergeant Kevin Vaughn, who arrived at the scene at around 10:30 p.m. Officer Jerry Anderson was riding with him. Both officers stepped out of their car and the sergeant approached the driver's door, told Mr. Harper to keep his hands visible, and grabbed his left hand. While holding Mr. Harper's hand, Sergeant Vaughn opened the car door, but Mr. Harper used his free hand to reach for the gear shift or steering wheel and sped away. Sergeant Vaughn and Officer Anderson rushed back to their car and followed Officer David Betts, who had also responded to the scene and was already in pursuit of the Camaro.

Officer Betts pursued Mr. Harper through residential neighborhoods. Mr. Harper was driving upwards of 75 miles per hour in areas with speed limits of 25 to 30 miles per hour and was ignoring stop signs and red lights. Officer Betts, who was required to slow

down at intersections, fell a few blocks behind, and following a short chase, found the Camaro crashed and abandoned in a residential front yard. A perimeter was established and a K-9 unit was called in.

Officers eventually saw Mr. Harper walking and gave chase. While chasing him, they noticed he was injured: his shirt was torn and his back was covered in blood. Mr. Harper ignored orders to stop and was captured when he slipped and fell in the snow. He was handcuffed, a cervical collar was placed on his neck, and he was taken to the hospital.

At the hospital, Mr. Harper was agitated, addressed an attending officer with homophobic slurs, and made vulgar sexual remarks to hospital staff. He said numerous times that he did not believe they were real medical staff and accused them of trying to hurt him.

When medical staff arrived to take Mr. Harper from a trauma room to get a CT[2] scan, the two officers present accompanied them to where the scan would be performed. An emergency room technician, James Pluid, helped transport Mr. Harper and was present to help move him to a table. Mr. Pluid was holding down Mr. Harper's uncuffed hand when Mr. Harper suddenly pulled his hand free and lunged, grabbing Mr. Pluid by the throat. Mr. Pluid and the officers pushed him down and officers detained him again in handcuffs. Mr. Harper had to be medicated before the CT scan could be performed.

---

[2] Computed tomography.

Mr. Harper was charged with first degree assault, for his assault of Kelly Krebs; theft of a motor vehicle; attempt to elude a police vehicle; and third degree assault, for his assault of James Pluid.

Defense counsel moved for a competency evaluation, which was ordered, and Mr. Harper was found incompetent to stand trial as a result of an "unspecified psychotic disorder, most likely methamphetamine induced." Clerk's Papers (CP) at 14. Competency restoration was ordered. After approximately six weeks, the court received a report from the state hospital that Mr. Harper was no longer exhibiting a methamphetamine-induced psychotic disorder and was competent to stand trial.

Six months later, defense counsel moved for a second competency evaluation, concerned that Mr. Harper was decompensating significantly. The motion was granted, but this time, an evaluation by Eastern State Hospital psychologist C. O'Donnell concluded that while Mr. Harper had a history of methamphetamine-induced psychosis, "he is not mentally ill" and had "exaggerate[d] both psychiatric symptoms and memory impairment." CP at 51. This time, Mr. Harper was found competent to stand trial.

In early 2019, after the State received a report by defense expert Michael Stanfill, PhD, on which Mr. Harper intended to rely for his defense, the trial court granted a State request that it order an evaluation of Mr. Harper's mental state at the time of his crimes. Mr. Harper was evaluated for this further purpose by Dr. O'Donnell.

The prosecution of Mr. Harper proceeded to trial in May 2019. The State called over a dozen witnesses, who testified consistent with the facts recounted above. In addition, Chelsea Harper testified that she was in the process of divorcing Mr. Harper. She testified that he did not like her working at the Dairy Queen, and she and Ms. Glick testified to prior conduct by Mr. Harper in an apparent attempt to get Ms. Harper fired. Officer McVay testified to a statement he had taken from Mr. Harper at the hospital, in which Mr. Harper explained his actions after commandeering his wife's Camaro as efforts to get Ms. Harper's attention. According to Officer McVay, Mr. Harper never said in the course of his statement that those actions were out of concern for his wife's safety or to protect her.

During presentation of the State's case, the defense objected to the State's presentation of evidence of property damage and witness apprehension on the night in question, since neither was the basis for his criminal charges. The trial court overruled the objection.

In the defense case, Mr. Harper testified on his own behalf and called Dr. Stanfill. Mr. Harper testified that all of his actions beginning with flagging down Officer McVay were taken only after God had told him in a very firm voice that his wife was in danger. He knew that people

> were going to hurt my wife and they were—they were going to kidnap her
> and hurt her because she's on meth and she's—they know that she's

8

homeless, she doesn't have anywhere to go.  She's just a helpless person.
They were going to rape her or steal her organs or something.

RP at 819-20.[3]

He testified that God told him exactly what to do.  He admitted taking his wife's car and driving away from police but explained that he thought his actions were necessary.  He denied ever trying to hit Mr. Krebs with the car, saying that Mr. Krebs kept jumping in front of him.  He admitted that he drove to the J&K lot and "smashed into [Mr. Krebs's] vehicle to get him to leave me alone."  RP at 843.  He testified that he had intended to give himself up when he was stopped on the median, but as the officer grabbed his wrist he saw the officer turn into the devil.  He testified that Ms. Harper did not want to divorce him and they would never get divorced.

Dr. Stanfill testified during his direct examination that Mr. Harper acted intentionally on the night of his crimes, but "suffered from a substance-induced psychotic disorder that was caused by methamphetamine and potentially synthetic stimulants, bath salts."  RP at 877.  He testified that as a result of the psychotic disorder, Mr. Harper "believed Ms. [Harper] was in danger.  He was attempting to protect her, and . . . was not exhibiting any more use of force than what was perceptually needed to keep her safe."  *Id.*  He testified that Mr. Harper believed the necessary force included ramming into cars that might be used to kidnap his wife.  *Id.*

---

[3] Ms. Harper testified that she had formerly used drugs with her husband, but after separating from him, she was sober.  RP at 486.

Toward the end of his direct examination, Dr. Stanfill testified to his diagnosis of Mr. Harper, which included antisocial personality disorder. He testified that his diagnosis was consistent with the findings of others who had evaluated Mr. Harper. He did not testify to anything more about the antisocial personality disorder diagnosis. Accordingly, when the State began cross-examining him about that diagnosis, the defense objected that it was outside of the scope of its direct examination. The objection was sustained.

The State called Dr. O'Donnell as a rebuttal witness; she testified that in her opinion, Mr. Harper was able to understand the nature and quality of his acts. She testified that during forensic examinations he exaggerated both his substance use and his report of auditory or visual hallucinations. She testified she did not believe he was faking on the night of his crimes, but his behavior was better explained by drug use than by a mental health issue. She testified it was consistent with being a possessive husband and angry about being taunted by Mr. Krebs.

Asked about how many times Mr. Harper had been evaluated, Dr. O'Donnell identified three competency-related evaluations in addition to Dr. Stanfill's and her own evaluations. She testified that there was no indication in Mr. Harper's history or from the several evaluations that he had any mental illness. It was her opinion that what might appear to be mental illness *symptoms* were attributable to Mr. Harper's drug use.

The jury found Mr. Harper guilty as charged. Based on his prior convictions for two most serious offenses—first degree manslaughter and second degree robbery—the court found him to be a persistent offender and sentenced him to life in prison for the first degree assault and low-end sentences on the remaining counts. Mr. Harper appeals.

ANALYSIS

While Mr. Harper's appeal was pending, the Washington Supreme Court decided *State v. Jenks*, 197 Wn.2d 708, 487 P.3d 482 (2021), in which Alan Jenks challenged his life without parole sentence imposed under the POAA. One of Mr. Jenks's strike offenses was second degree robbery, which the legislature had removed from the list of most serious offenses in 2019, and Mr. Jenks contended that the legislation should apply to his case. *Id.* at 711 (citing ENGROSSED SUBSTITUTE S.B. 5288, 66th Leg., Reg. Sess. (Wash. 2019)). The Supreme Court decided the issue adversely to Mr. Jenks, thereby resolving identical challenges that Mr. Harper raised to his sentence in this appeal.

The court's opinion observed that while it would not order that Mr. Jenks be resentenced, he would be entitled to resentencing under a "legislative fix." *Id.* at 713 n.2. Legislation enacted earlier this year mandates resentencing for those, like Mr. Jenks and Mr. Harper, whose "persistent offender" status depended on a current or past conviction for second degree robbery. *Id.* at 711-12; *and see* LAWS OF 2021, ch. 141 (effective July 25, 2021).

11

We turn to Mr. Harper's remaining assignments of error. He contends that the State committed prosecutorial misconduct and admitted evidence of other crimes or wrongs in violation of ER 404(b).[4]

I.      PROSECUTORIAL MISCONDUCT

Mr. Harper contends the State committed prosecutorial misconduct during closing argument in two ways: by misstating the law to the jury on a critical legal issue and by testifying to facts not in the record.

Prosecutorial misconduct is not attorney misconduct in the sense of violating rules of professional conduct. *State v. Fisher*, 165 Wn.2d 727, 740 n.1, 202 P.3d 937 (2009). It is, instead, a term of art that refers to "prosecutorial mistakes or actions [that] are not harmless and deny a defendant [a] fair trial." *Id*. "To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). A defendant demonstrates prejudice by proving there is a "'substantial likelihood the instances of misconduct affected the jury's verdict.'" *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 481-82, 965 P.2d 593 (1998) (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995)). Courts

---

[4] Mr. Harper also contends that cumulative error deprived him of a fair trial. Since we find no error or abuse of discretion, the cumulative error doctrine does not apply.

recognize the possibility that juries will give special weight to the State's argument.

*State v. Glasmann*, 175 Wn.2d 696, 706, 286 P.3d 673 (2012) (citing the commentary on

*American Bar Association Standards for Criminal Justice* std. 3-5.8).

When a defendant fails to object in the trial court to a prosecutor's statements, he

waives his right to raise a challenge on appeal unless the remark was so flagrant and ill-

intentioned that it evinced an enduring and resulting prejudice that could not have been

neutralized by an admonition to the jury.  *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d

1239 (1997).  The analysis focuses more on whether the resulting prejudice could be

cured had the defendant raised a timely objection.  *State v. Loughbom*, 196 Wn.2d 64, 75,

470 P.3d 499 (2020).

> A.    *Misstating the law*

During rebuttal closing argument, the prosecutor told the jury:

> [I]t is not necessary to inflict bodily harm *and the actor, meaning Mr.*
> *Harper, doesn't need to actually intend to inflict bodily injury.  What he*
> *intends to do is to create in another apprehension and imminent fear of*
> *bodily injury, which is what you witnessed there.*  And so based upon their
> interaction, ladies and gentlemen, Mr. Harper did intend to assault Mr.
> Harper—or I'm sorry, Mr. Harper did intend to assault Mr. Krebs that
> night, and the State has proven that beyond a reasonable doubt.

RP at 1052 (emphasis added).

The highlighted language misstated the law.  In identifying the conduct that

constitutes first through fourth degree criminal assault, the Washington criminal code

does not define "assault" so the common law applies, and one definition of assault

13

recognized by Washington courts is putting another in apprehension of harm whether or not the actor actually intends to inflict or is incapable of inflicting that harm. *State v. Hupe*, 50 Wn. App. 277, 282, 748 P.2d 263 (1988). But that sort of assault does not constitute *first degree* assault. In Washington, a person is guilty of assault in the first degree only if he commits one of four acts of assault "with intent to inflict great bodily harm." RCW 9A.36.011(1). Mr. Harper was charged with intending to inflict great bodily harm while "[a]ssault[ing] another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death." RCW 9A.36.011(1)(a).

The defense did not object to the prosecutor's misstatement of law. The State concedes an "arguabl[e]" misstatement of law, but contends it was fleeting and in context, the prosecutor simply misspoke. Br. of Resp't at 20. It emphasizes that the jury was properly instructed and any confusion could have been cured had the defense objected. Mr. Harper argues, however, that the prestige associated with the prosecutor's office lent special weight to the prosecutor's argument. Br. of Appellant at 11 (citing *Glasmann*, 175 Wn.2d at 706). It emphasizes that Mr. Harper's "entire defense to the first-degree assault charge was that he had not intended to hurt Mr. Krebs." *Id.* at 12.

It is misconduct for a prosecutor to misstate the law. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015), *aff'd*, 192 Wn.2d 526, 431 P.3d 117 (2018). It is clearly improper to do so in addressing a clear point of law material to a contested element of a charge.

Mr. Harper fails to establish prejudice, however. While Washington courts acknowledge the *possibility* that a jury will give special weight to a prosecutor's argument, more than that possibility must be shown to establish prejudice. Unlike *Allen*, on which Mr. Harper relies, the misstatement of the law in this case was not repeated, there was no ruling on an objection during closing argument that could have left the jury with the impression that the misstatement of law was correct, and the jury raised no question during deliberations that revealed confusion on the issue.

Mr. Harper argues that the issue of intent was likely the most complex legal issue in the jury's instructions, but we disagree. The general assault instruction allows for apprehension of bodily injury, but the to-convict instruction explicitly told the jury that one of the elements that must be proved beyond a reasonable doubt was "(3) That the defendant acted with intent to inflict great bodily harm." CP at 111.

Any prejudice was slight, and could have been neutralized with a curative instruction.

*Reference to Mr. Harper's antisocial personality disorder diagnosis*

As noted, during his direct testimony, Dr. Stanhill touched on the fact that he had diagnosed Mr. Harper with antisocial personality disorder. He did not elaborate on the diagnosis, and when the State sought to explore the diagnosis on cross-examination, the objection was sustained.

During Dr. O'Donnell's testimony in the State's rebuttal case, she testified that she had diagnosed Mr. Harper with substance use disorder, primarily methamphetamine, and testified that Mr. Harper had a history of substance-abused psychosis and "antisocial traits." RP at 932-33, 940. The defense did not object to that testimony. It also did not object when Dr. O'Donnell testified that one consistent conclusion across the evaluations that Mr. Harper had undergone was that he "was antisocial." RP at 947. When Dr. O'Donnell was asked to explain what "antisocial personality disorder" is, however, the defense objected and the court sustained the objection, stating the testimony did not have "any bearing as to the issues raised by the defendant's expert." RP at 947-48.

During closing, the prosecutor advanced the following argument, and was met with the following objection:

> [W]hat you also have to understand is that across five separate evaluations, the other consistent has been the antisocial personality diagnosis.
>
> [DEFENSE COUNSEL]: Objection, Your Honor. That fact wasn't permitted into evidence.
>
> THE COURT: Overruled. The diagnosis was permitted but not what factors are taken into consideration in making that diagnosis. So you're welcome to comment on the diagnosis but not beyond that.
>
> [PROSECUTOR]: Thank you.
>
> Antisocial personality, *a difficult person, difficult to deal with. And that's what we've got here, a difficult person* who didn't want to have to deal with the break-up of his marriage that he caused and, over the course of time, progressively escalated his attempts to get Chelsea Harper fired. I mean, think about it, ladies and gentlemen, why else on that night, 30 minutes before he flags down the officers, says she's going to be—she is

16

being raped, she's been kidnapped, but yet he calls 9-1-1 that night and he tells them that she's suicidal; two conflicting stories. It's going to be whatever story is going to get him to achieve his goal.

RP at 1054-55 (emphasis added). The defense did not object to this continued argument.

Mr. Harper now argues that the continued argument was the prosecutor "delv[ing] deeper into the meaning of th[e] diagnosis," and thereby testifying to facts that were not in evidence. Br. of Appellant at 13. During closing argument, it is improper for a prosecutor to make statements or submit facts to the jury that are not supported by the evidence. *Glasmann*, 175 Wn.2d at 705-06.

We reject the premise that the prosecutor believed or intended to convey to the jury that the criteria for diagnosing antisocial personality disorder is "being a difficult person." As one would expect, the criteria are more complex (and more contemptible).[5] The prosecutor's argument is more reasonably explained as an inference the prosecutor believed could be drawn from the diagnosis, or from Dr. O'Donnell's unobjected-to testimony that the psychologists who evaluated Mr. Harper all characterized him as exhibiting "antisocial traits." Among the meanings of "antisocial" are

**1**      **:** averse to the society of others **:** UNSOCIABLE

**2**      **:** hostile or harmful to organized society
        *especially* **:** being or marked by behavior deviating sharply from the social norm

---

[5] *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS DSM- 5, at 659 (5th ed. 2013).

MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com /dictionary/antisocial (last visited Aug. 6, 2021). "[T]he prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'" *Fisher*, 165 Wn.2d at 747 (quoting *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014)).

Nevertheless, when a subject requires the specialized knowledge of experts, the lawyers' arguments should not stray far from the testimony, and a timely objection might have been sustained. Most importantly, however, a timely objection would have cured any prejudice. "Difficult" is not charged language that would leave a lasting impression on the jury. To say that Mr. Harper was "a difficult person" did not introduce a new, inculpatory aspect of character that was unlike other evidence about Mr. Harper presented during the trial.

Finally, Mr. Harper asserts that the prosecutor's statements "explicitly invited the jury to conclude that he had a psychological predilection for criminal behavior." Br. of Appellant at 14. The prosecutor's statements "explicitly" did no such thing, nor was the notion implied. The jury was properly instructed on the difference between evidence and argument. We are unpersuaded that any juror would find a "psychological predilection for crime" that no expert testified existed based on the prosecutor's brief argument that Mr. Harper was a difficult person.

II.     RELEVANCE OBJECTIONS TO UNCHARGED CONDUCT

The jury was presented with considerable testimony and documentary evidence about the physical damage wrought by Mr. Harper on the night of his crimes, as well as evidence that his actions caused people inside the Dairy Queen restaurant to be fearful. Some of the evidence was admitted over defense objections. Mr. Harper argues that it was extensive evidence of uncharged conduct that was inadmissible under ER 404(b).

A threshold issue is whether, as the State argues, the challenge to the admissibility of the evidence under ER 404(b) is being raised for the first time on appeal. We conclude that it is.

During pretrial discussion of motions in limine, the trial court asked the prosecutor, "[D]oes the State have any 404(b) evidence?," and the prosecutor answered, "No, Your Honor." RP at 181. Evidently, the State did not perceive its planned presentation as implicating ER 404(b). Defense counsel was on notice of that perception.

Later, during Ms. Harper's testimony, when the State began asking her about Mr. Harper crashing into the Dairy Queen building, defense counsel objected on relevance grounds. The trial court excused the jury and gave defense counsel an opportunity to expand on her objection. While defense counsel pointed out that Mr. Harper's driving into the building and other cars in the parking lot were not charged offenses, she did not mention ER 404. She did not use any of the rule's recognizable terminology, such as "character evidence," "other crimes, wrongs, or acts," or proving "action in conformity."

19

She did not argue that the rule's permitted purposes (motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident) would not apply. She did not address the several step analysis required by ER 404(b). In short, her argument that driving into the building was not a charged offense appeared to be nothing more than an argument that the evidence was not relevant under ER 401. We do not see why the trial court would have understood her to be making an ER 404(b) objection.

Later, when a relevance objection was being made and the trial court thought ER 404(b) was implicated, the *trial court* brought up the rule. *See* RP at 495. It concluded that proposed evidence about staff concern for Ms. Harper's safety on past occasions when Mr. Harper showed up at the Dairy Queen was "starting to turn . . . into 404(b) evidence" and sustained an objection. *Id.*

Considering the trial record as a whole, the trial court addressed ER 404(b) when it perceived counsel to be relying on that rule. It reasonably perceived Mr. Harper's objections to evidence of uncharged criminal behavior on the night of his crimes as what counsel said they were: relevance objections.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. It represents a low bar, such that "[e]ven minimally relevant evidence is admissible." *State v. Darden*, 145 Wn.2d 612, 621, 41

20

P.3d 1189 (2002). A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion. *Id.* at 619.

The State responded to Mr. Harper's relevance objection by pointing out that the evidence of Mr. Harper's behavior throughout his less-than-hour-long spree was relevant as res gestae, was evidence of intent, and was evidence of motive. The trial court observed that it was also evidence that he exerted unauthorized control over the Camaro he was charged with stealing. It observed that the evidence was not unduly prejudicial in light of the clearly admissible evidence of Mr. Harper's use of the vehicle in committing first degree assault.

The evidence was relevant for all of the reasons raised by the State and the trial court. Mr. Harper stole his wife's car and used it throughout his criminal spree. It was relevant as res gestae—evidence that completes the story of the crime on trial by proving its immediate context of happenings near in time and place. *State v. Grier*, 168 Wn. App. 635, 646, 278 P.3d 225 (2012) (citing *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995)). Mr. Harper's collisions with Mr. Krebs's and others' cars is what drew Mr. Krebs to the Dairy Queen lot, where he was assaulted. And Mr. Harper's explanation for causing the property damage was all of a piece with his explanation of the crimes with which he *was* charged: he claimed he was trying to attract the attention of police to help save his wife. He, as much as the State, needed to tell the "whole story" about the property damage and apprehension he caused.

The evidence was also relevant in showing a series of actions that the State could argue were related and goal-oriented, and therefore intentional. It was relevant to the State's theory that Mr. Harper had a motive for his actions: a frustration with the breakup of his marriage and a desire to force Ms. Harper to pay attention to him. No abuse of discretion in overruling the defense objections is shown.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Fearing, J.