IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38436-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SHANE MICHAEL PEARSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J.P.T.* — Shane Pearson appeals his conviction for second degree

assault. He demonstrates an error in his sentence that requires correction, but no other

error or abuse of discretion. We affirm his conviction and remand for a ministerial

correction of his term of community custody.

FACTS AND PROCEDURAL BACKGROUND

On an evening in late May 2021, Cle Elum police were dispatched to the home of

Randi Chalmers in response to a 911 call. According to responding officer Richard Albo,

Ms. Chalmers told him that her son, Shane Pearson, had been holding a knife and

threatened to stab her. She told the officer that her son was still at the home, upstairs.

Officer Albo yelled up to announce a police presence and told Mr. Pearson to come

---

* Judge Laurel H. Siddoway was a member of the Court of Appeals at the time
argument was held on this matter. She is now serving as a judge pro tempore of the court
pursuant to RCW 2.06.150.

down.  After some delay (Mr. Pearson feared arrest on an outstanding warrant), Mr. Pearson joined officers and his mother downstairs, where he was read his *Miranda*[1] rights and agreed to speak.  Mr. Pearson told officers he had been holding a knife and told his mother he was going to stab her, but he was being sarcastic.

Officers also questioned Jill Smith, a former girlfriend of Mr. Pearson, who was living with Ms. Chalmers at the time.  They collected as evidence the steak knife identified as the knife Mr. Pearson had been holding.  Based on the officers' interviews with Ms. Chalmers and Ms. Smith, Mr. Pearson was charged with second degree assault (with a deadly weapon) of both women.  Both were charged as domestic violence crimes.

The charges proceeded to a jury trial less than two and one-half months later.  At trial, the prosecutor told jurors in opening statement that she would be calling as witnesses both alleged victims—Ms. Smith and Ms. Chalmers—but warned jurors that Ms. Chalmers had not wanted her son to be prosecuted and was expected to be a reluctant witness.

*Jill Smith's testimony*

Jill Smith was the State's first witness.  She said Ms. Chalmers had been putting pressure on her not to testify, telling Ms. Smith that she would be to blame if Mr. Pearson went to jail.  She said Ms. Chalmers had told her as recently as that morning that if she testified against Mr. Pearson, she would not allow her to live at her home anymore.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Ms. Smith testified that on the evening of Mr. Pearson's arrest, she and Ms. Chalmers had both been arguing with Mr. Pearson. She said it was common for them to argue. In her case, she testified, she was trying to get ready to go out and did not want Mr. Pearson in their bedroom, but he insisted on coming in to discuss something. She said she was not dating Mr. Pearson at the time, but they still shared the room, characterizing their situation as "complicated." Rep. of Proc. (RP) at 111. At some point, Mr. Pearson left and went downstairs. Ms. Smith then went downstairs herself to use the bathroom and encountered Mr. Pearson in the downstairs hallway, holding a knife and arguing with his mother. She was "a little worried" at that point, she testified, adding, "I didn't want him to harm her, you know." RP at 112. She acknowledged fearing for a brief moment "[t]hat he might actually use the knife" against "either one of us" but she "was more concerned about his mother." RP at 113. Asked what made her fearful, she answered, "He just—he—seemed enraged and—irrational at the time." RP at 113. She added, "he wasn't in—right state of mind to have the knife, and it felt— it felt threatening at the time." RP at 114.

Ms. Smith testified that she went back upstairs and, at some point, Mr. Pearson followed her. When he reached the top of the stairs, she saw that he was still holding the knife. She and Mr. Pearson continued to argue, yelling at each other, as she "debat[ed] in [her] own head" whether he would do something violent toward her. RP at 115. She testified that he made a couple of threats: one was to burn the house down; the other was

3

to kill her and her friends. She testified that she "[didn't] think he meant it," but "he was enraged." RP at 117. She *did* think he was trying to scare her.

When cross-examined, Ms. Smith testified that she did not know why Mr. Pearson had the knife when she first saw him with it, but said, "I honestly thought he had picked it up to be threatening." RP at 125. Asked if he could have picked it up to trim some rubber from his bicycle tires (an explanation he later offered), Ms. Smith testified it was possible, but she did not see how that would be the reason. She later explained that she had no recollection of Mr. Pearson going outside to work on his bike during that time frame, and she also did not think that was something he would be doing "if he was that enraged." RP at 130.

Ms. Smith was asked by defense counsel if she told Officer Albo that Mr. Pearson threatened her upstairs, and Ms. Smith admitted that she did not. She added, "It was difficult to say anything at that time because his mother was there as well." RP at 128. She was also asked by defense counsel if she might have misread the situation when she saw Mr. Pearson holding the knife and arguing with his mother, and answered:

A     No.
Q     Why not.
A     They weren't joking.
Q     Okay. What makes you say that.
A     The—seriousness in their voice.

RP at 131.

*Randi Chalmers's testimony*

Ms. Chalmers was the State's second witness. She acknowledged having been subpoenaed and that she had not wanted to appear at the trial. She testified that her argument with Mr. Pearson on the day of his arrest was started by her, over his failure to wash dishes he had left in her kitchen for a few days. She said they yelled at each other. She professed trouble remembering what she told police when they arrived, explaining "I don't have a very good memory." RP at 139. She admitted that when she and her son argue "we say mean things, we—hurtful things." RP at 140.

Asked about particulars, Ms. Chalmers admitted that Mr. Pearson had a knife, but claimed to not remember much else:

Q    Did he have a knife?
A    Yeah, he did.
Q    Okay. And do you remember him making any threats to you.
A    Oh, we make threats to each other all the time.
Q    What did he threaten you that day?
A    I don't know. I know he's threatened [to] burn my house down but he did that quite often.
Q    Okay. Did he threaten to smash your head in.
A    I don't think so honestly. I don't know on that one.
Q    Did you tell the police that he threatened to smash your head in.
A    I don't know.
Q    Okay. Did he threaten to—stab you.
A    I don't know.
Q    Okay. Did—tell the police that he threatened to stab you.

5

. . . .

A     Honestly I don't know.

Q     Okay.

A     I could have. I may have. I may not have.

RP at 140-41.

Asked if she believed Mr. Pearson was going to hurt her that day, Ms. Chalmers answered, "I don't think that he would have done it, honestly. You know, he's threatened to—like I say, he's threatened to burn my house down, threatened to—you know, kick my butt, whatever, you know. . . . We say mean things when we're arguing . . . I'm sure I've said plenty of mean things to him back." RP at 143.

*Officer Richard Albo's testimony*

Officer Albo was the State's last witness. Before his testimony, there was discussion outside the presence of the jury about defense counsel's concern that the State intended to ask Officer Albo about statements Ms. Chalmers had made to him. The trial court ruled that the State could question him for impeachment purposes, and the court would give the jury a limiting instruction. The court said impeachment could include statements that Ms. Chalmers claimed not to remember, stating that Ms. Chalmers's lack of memory "maybe 70 days after the . . . incident" "seems very convenient." RP at 168.[2]

---

[2] The alleged assaults occurred on May 31, and Ms. Chalmers was testifying on August 10.

6

Officer Albo testified that he arrived at Ms. Chalmers's home in response to a dispatch at about 6:00 p.m. He said Ms. Chalmers, who he recognized, "seemed afraid to me," describing her as wide-eyed, very excited, and speaking to him loudly and quickly. RP at 179. She told him that Mr. Pearson had a knife and threatened to stab her. He also spoke with Ms. Smith, who he described as shy and unwilling to make eye contact; he testified that she, too "seemed afraid." RP at 179. He spoke to Mr. Pearson when he came downstairs and testified about Mr. Pearson's version of what happened:

> A    . . . [H]e said he was arguing with Ms. Chalmers, and—at one point during the argument he picked up the knife, and Ms. Chalmers said, "What are you going to do with that? Stab me", and he said, "Yeah, I'm gonna stab you," but he described that as being in a sarcastic manner.
>
> Q    Okay. So he told you he—he may have said—stab her but that he'd done it in a joking way.
>
> A    Correct.
>
> Q    Okay. Anything else he told you that was pertinent—He admitted they were arguing?
>
> A    Yes.

RP at 180-81.

In cross-examination, defense counsel established that Ms. Smith had not told Officer Albo about Mr. Pearson bringing the knife upstairs or that he threatened to stab her with the knife when they were upstairs.

7

*Shane Pearson's testimony*

The sole witness for the defense was Mr. Pearson. He, too, testified that the argument with his mother on the day of his arrest started because he had not done his dishes. She had told him to get his stuff and get out, and if he did not take his things, she would throw them out. Mr. Pearson said he began to gather his things as he and his mother continued arguing. At one point, he said, he got a knife to cut some rubber off his bike tires because the weight of what he was going to take in his backpack was causing the tires to scrape the frame. He testified:

> My mom came around the corner and said, "Where"—'cause I had the knife in my hand, and—she said, "What, are you gonna stab me." And I said, "Yeah, Mom, I'm gonna stab you." And it was totally sarcastic. It was not—That was it.

RP at 195. At that point, he testified, Ms. Smith came down the stairs and his mother "mentioned to Jill that I'd threatened her." RP at 196. He testified,

> at that point I said, "Yeah, Mom," and I said it to Jill, and I was saying, "Yeah, Mom, I'm gonna kill you guys and smash your heads in." And then at that point the knife was out of my hands on the counter, the kitchen counter.

RP at 196-97. He denied ever following Ms. Smith upstairs with the knife or ever threatening her upstairs.

In closing argument, the prosecutor spoke three times about the fact that the 911 call had been made by someone outside Ms. Chalmers's home. The fact that someone outside the home called 911 was in evidence. It had come in through Ms. Smith, who

8

testified that at one point Mr. Pearson's cousin came in the house and saw what was going on; she also testified that she heard it was the cousin who called police. Mr. Pearson had also testified that he, his mother, and Ms. Smith did not make the 911 call; he testified that "[s]omebody not in [the] house called the police." RP at 202.

The prosecutor's first mention of the call was in the context of arguing that jurors should find that Ms. Chalmers was assaulted even though Ms. Chalmers denied it. The prosecutor told jurors, "And somebody outside the home calls 9-1-1. That's how serious this was, regardless of what Randi says." RP at 243. In wrapping up her initial closing argument, the prosecutor touched on the topic again, stating, "[I]f this was all a big joke, just a sarcastic comment made in jest during a somewhat volatile argument, why did someone who was outside the home call 9-1-1." RP at 244. Defense counsel did not object to either reference to the call.

The prosecutor brought the topic up a third time in her rebuttal closing, telling jurors that defense counsel had not provided an answer for why someone outside the home would have called police. She argued,

> There's no answer to that. Why did somebody outside—because this situation was ridiculously scary and intense. Somebody outside the house called 9-1-1 *and said something about "There's a domestic going on and you've got to get there."* Does that happen when you sarcastically say to your mom, "Oh, yeah, Mom, I'm gonna kill you."

RP at 254 (emphasis added). Again, defense counsel did not object.

9

The jury found Mr. Pearson guilty of the second degree assault of Ms. Smith, but acquitted him of the charge of assaulting Ms. Chalmers.

At sentencing, given the opportunity to allocute, Mr. Pearson said of some of his prior convictions, "they're all old, and with those convictions, I pled out to a lot of those. . . . I didn't take 'em to trial because I knew I was guilty of—of those offenses, so I did plead out to those offenses. This I took to trial because I am innocent." RP at 279. For the first time at sentencing, Mr. Pearson stated that he had been high on drugs the day of the assault,[3] and his lawyer requested a prison-based drug offender sentencing alternative (DOSA) while admitting that by statute, Mr. Pearson did not qualify. The court agreed that Mr. Pearson was not eligible for a DOSA and said it would not impose one even if it could, which evidently angered Mr. Pearson because he lashed out after that a couple of times. He said at one point, "It would have given me (inaudible) too if the— if the prosecutor wouldn't have maliciously prosecuted me and gave me a lesser charge instruction too in my instructions." RP at 288. Mr. Pearson later said to the court, "So, who pays for all this? I mean, who—who can I sue, your Honor? Who—who—who pays for all this? Who pays for my time—" RP at 289.

The court imposed a mid-range sentence of 73 months' confinement and imposed 36 months of community custody. Mr. Pearson appeals.

---

[3] He stated, "You know, I know that I haven't told you that, 'Hey, I was high that day,' but, your Honor, I was. And that's—honest truth." RP at 290.

ANALYSIS

Mr. Pearson assigns error to ineffective assistance of counsel, prosecutorial misconduct, and that the trial court exceeded its authority by imposing 36 months of community custody. The court had completed the community custody provision of his judgment and sentence as if Mr. Pearson was found guilty of a serious violent offense.

The third assigned error is clear. Second degree assault is a violent offense under former RCW 9.94A.030(55)(a)(viii) (2020), not a serious violent offense under RCW 9.94A.030(46). RCW 9.94A.701(2) states that the court "shall, in addition to the other terms of the sentence, sentence an offender to community custody for eighteen months when the court sentences the person to the custody of the department for a violent offense that is not considered a serious violent offense." "The word 'shall' in a statute . . . imposes a mandatory requirement unless a contrary legislative intent is apparent." *Erection Co. v. Dep't of Lab. & Indus.*, 121 Wn.2d 513, 518, 852 P.2d 288 (1993). We remand with directions to correct the community custody term.

Mr. Pearson's remaining assignments of error relate to his complaint that his trial lawyer did not request an inferior degree offense instruction for fourth degree assault, and the prosecutor's statement in rebuttal closing that the 911 caller had said "something about 'There's a domestic going on and you've got to get there.'" RP at 254.

I.     MR. PEARSON DOES NOT DEMONSTRATE INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Pearson argues that his statement at sentencing, "if the prosecutor wouldn't have maliciously prosecuted me and gave me a lesser charge instruction," RP at 288, shows he did not understand that the defense can ask that the jury be instructed on an inferior degree offense. He asks us to infer that his trial lawyer failed to consult with him about that option and, indeed, that rather than make the strategic decision to pursue an "all or nothing" strategy, his trial lawyer was unaware of the alternative. Mr. Pearson argues that this was ineffective assistance of counsel, and we should order a new trial.

RCW 10.61.003 provides that when a defendant is charged with an offense consisting of different degrees, "the jury may find the defendant not guilty of the degree charged in the indictment or information, and guilty of any degree inferior thereto . . . ." For a jury to be instructed on an inferior degree offense, however, the evidence must permit a jury to rationally find the defendant guilty of the lesser offense. *State v. Coryell*, 197 Wn.2d 397, 415, 483 P.3d 98 (2021). There must be evidence that affirmatively establishes the inferior degree offense. *Id.* at 414-15. The defendant must be entitled to the inferior degree instruction based on the evidence actually admitted. *Id.* at 406. A defendant is not entitled to the instruction merely because a jury could ignore some of the evidence. *Id.* at 406-07.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to the effective assistance of counsel.

12

To prevail on an ineffective assistance of counsel claim, a defendant must meet the *Strickland* test adopted by Washington from the United States Supreme Court, showing both (1) deficient performance and (2) resulting prejudice. *State v. Estes*, 188 Wn.2d 450, 457-58, 395 P.3d 1045 (2017) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Performance is deficient if it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The prejudice prong requires the defendant to show that "but for the ineffective assistance, there is a reasonable probability that the outcome would have been different." *State v. Cienfuegos*, 144 Wn.2d 222, 227, 25 P.3d 1011 (2001).

"When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). A defendant alleging ineffective assistance must overcome a strong presumption that counsel's representation was effective and reasonable. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

Our Supreme Court has recognized that even if a defendant is entitled to instruction on an inferior degree offense, a trial lawyer's decision to forgo the instruction in favor of an "'all or nothing' approach" is not necessarily evidence of deficient performance. *Cf. State v. Grier*, 171 Wn.2d 17, 20, 246 P.3d 1260 (2011) (entitlement to instruction on a lesser included offense). After considering guidelines provided by the American Bar Association Standards and Washington's Rules of Professional Conduct,

13

the court in *Grier* characterized the decision as "[p]art tactic, part objective," and held

that while it requires input from both the defendant and her counsel, the decision

ultimately rests with defense counsel. *Id.* at 30.

Applying these principles, for Mr. Pearson to establish the *deficient representation*

prong of his ineffective assistance of counsel claim, he must demonstrate that (1) he was

(a) unaware of the option to request instruction on fourth degree assault, (b) was not

consulted by his trial lawyer, (c) would have favored asking for the instruction, and

(d) would have obtained the all-important agreement of his lawyer to that strategy; and

(2) would have been entitled to the instruction. To establish the equally necessary

*prejudice* prong, Mr. Pearson must demonstrate that had the jury been instructed on

fourth degree assault as an inferior degree offense, it would not have found him guilty of

second degree assault.

We doubt Mr. Pearson's ability to make most of these showings. Of the 23 prior

convictions included in his criminal history, 3 were for domestic violence fourth degree

assault, committed in 2004, 2010, and 2013, so he was familiar with the inferior degree

offense. He told the court at sentencing that the reason he had gone to trial rather than

negotiate a plea in this case was "because I am innocent," RP at 279, a position

inconsistent with giving the jury an additional basis on which to find him guilty. His

briefing on appeal points to no evidence actually admitted from which the jury could find

(without just ignoring evidence) that he committed an intentional assault of Ms. Smith while not armed with a knife.

We can most readily dispose of Mr. Pearson's claim of ineffective assistance of counsel for two other reasons, however. As earlier observed, we presume counsel was effective. An "all or nothing" approach can be legitimate strategy. *State v. Conway*, 24 Wn. App. 2d 66, 71-73, 519 P.3d 257 (2022), *review denied*, 200 Wn.2d 1032, 525 P.3d 151 (2023). Mr. Pearson fails to show that it was not legitimate strategy in his case. Absent evidence of a failure of counsel to consult with a defendant, *Strickland*'s highly deferential standard requires us to presume that consultation occurred. *State v. Breitung*, 173 Wn.2d 393, 400-01, 267 P.3d 1012 (2011). If Mr. Pearson has competent evidence to challenge this, he could present it in a personal restraint petition, but our second reason for rejecting his ineffective assistance of counsel claim would still prove fatal.

The second reason for rejecting the claim is that Mr. Pearson cannot show the required prejudice. Had the jury been instructed on an inferior degree offense, it would have been instructed to first fully and carefully deliberate on second degree assault. Only if it was not satisfied beyond a reasonable doubt that Mr. Pearson was guilty of that charge, would it be instructed to consider fourth degree assault. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL § 4.11, at 104 (5th ed. 2021). As the Supreme Court reasoned in *Grier*, "[a]ssuming, as this court must, that the jury would not have convicted Grier of second degree murder unless the State had

met its burden of proof, the availability of a compromise verdict would not have changed the outcome of Grier's trial." 171 Wn.2d at 43-44. The same is true here: Mr. Pearson's jury found him guilty of second degree assault and he offers no reasoned argument that instruction on an inferior degree offense would, within reasonable probabilities, change that.

II.    ERROR IN THE PROSECUTOR'S ATTRIBUTION OF CONTENT TO THE 911 CALL WAS
       WAIVED BY THE FAILURE TO OBJECT

Mr. Pearson's remaining assignment of error is to the prosecutor's statement in her rebuttal closing argument that the 911 caller had "said something about 'There's a domestic going on and you've got to get there.'" RP at 254.

Prosecutorial misconduct is not attorney misconduct in the sense of violating rules of professional conduct. *State v. Fisher*, 165 Wn.2d 727, 740 n.1, 202 P.3d 937 (2009). It is, instead, a term of art that refers to "prosecutorial mistakes or actions [that] are not harmless and deny a defendant [a] fair trial." *Id.* To succeed on a prosecutorial misconduct claim, an appellant has the burden of establishing that the prosecutor's conduct was improper (as being at least mistaken) and was prejudicial. *State v. Stenson*, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997). A defendant demonstrates prejudice by proving there is a "'substantial likelihood the . . . misconduct affected the jury's verdict.'" *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 481-82, 965 P.2d 593 (1998) (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995)).

16

Because Mr. Pearson failed to object at trial, his claimed error is considered waived "unless he establishes that the misconduct was so flagrant and ill-intentioned that an instruction would not have cured the prejudice." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). "[T]he focus of this inquiry is more on whether the resulting prejudice could have been cured, rather than the flagrant or ill-intentioned nature of the remarks." *State v. Pierce*, 169 Wn. App. 533, 552, 280 P.3d 1158 (2012).

As earlier noted, evidence was presented that the 911 call was made by someone outside the home. That fact had also been fleetingly mentioned in both party's opening statements, without objection.[4] There was no evidence that the 911 caller said something about, "[t]here's a domestic going on and you've got to get there." The gist of the prosecutor's argument, however, was that the jury could infer from the fact that an outsider made the call, that what could be heard outside sounded dangerous or threatening. Only the prosecutor's attribution of content to the call was unsupported by the evidence, and the content of the call was not her point.

---

[4] The prosecutor stated during opening statement, "On May 31st of 2121 [sic] the police were called, and somebody who wasn't involved said, 'You need to get to this address. Something bad is happening there.'" RP at 94.

Defense counsel said during his opening statement that Mr. Pearson and his mother had been "screaming at the top of their lungs at each other, in the kitchen—you know, there's no microphone but it would be definitely be rated X if—if there was. And they're screaming loud enough that the lady that lives in the property in her trailer hears 'em, and, 'Oh, my god, they're really goin' at it.'" RP at 99.

A relatively common basis for objection during closing argument is when one of the lawyers tells the jurors something about events that was not part of the evidence presented during the trial. Both sides' lawyers know more about the factual background of the case than gets presented during the trial, and they sometimes misremember what was presented. For either lawyer to provide jurors with information outside the trial record is misconduct. But it does happen and the Washington pattern concluding instruction anticipates it. When it does happen, and an objection is made, trial judges are typically ready with a reminder from the concluding instruction: "[T]he lawyers' statements are not evidence. The evidence is the testimony and the exhibits. . . . You must disregard any remark, statement, or argument that is not supported by the evidence . . . ." *See* Clerk's Papers at 15.

This instruction (or one like it) is regularly used to cure any prejudice and could have cured any prejudice here. Error was waived by failing to object.

If we reject Mr. Pearson's allegation of prosecutorial misconduct, he asks us to find that his trial lawyer's failure to object was ineffective assistance of counsel. He is unable to demonstrate the required prejudice, however. The trial court would undoubtedly have provided a curative instruction, but it would have echoed the instructions that had been read immediately before the closing arguments. And nothing about the content that the prosecutor attributed to the 911 call would have been

No. 38436-5-III
*State v. Pearson*

prejudicially different from what jurors would assume was said by someone making a 911 call from outside the home.

We affirm the conviction and remand with instructions to correct the judgment and sentence to reflect an 18-month term of community custody.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_Siddoway, JPT_
Siddoway, J.P.T.

WE CONCUR:

_Lawrence-Berrey, A.C.J._
Lawrence-Berrey, A.C.J.

_Staab, J._
Staab, J.

19