IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 40829-9-III |
| | ) | |
| | ) | |
| THUNDER RAY DANZUKA, | ) | |
| | ) | |
| Petitioner. | ) | UNPUBLISHED OPINION |
| | ) | |

COONEY, A.C.J. — Thunder Danzuka was convicted of three counts of rape of a

child. Mr. Danzuka appealed the convictions. We affirmed.[1] In this personal restraint

petition (PRP), Mr. Danzuka argues his trial attorney was ineffective in failing to

effectively cross-examine the victim and impeach the victim with her prior inconsistent

statements. We disagree with Mr. Danzuka's argument and deny his petition.

## BACKGROUND

Mr. Danzuka and J.G.'s mother began dating in 2010 when J.G. was

approximately nine years old. Mr. Danzuka resided with the family from 2010 until J.G.

---

[1] *State v. Danzuka*, No. 38982-1-III (Wash. Ct. App. Oct. 31, 2023) (unpublished),
https://www.courts.wa.gov/opinions/pdf/389821_unp.pdf.

was about 13 years old.  A few years later, J.G. alleged Mr. Danzuka had sexually abused

her, and J.G.'s mother reported the abuse to law enforcement.

The State charged Mr. Danzuka with two counts of rape of a child in the first

degree and one count of rape of a child in the second degree.  The first trial ended in a

mistrial after the jury became "deadlocked" during deliberations.  PRP App. D at 505.

Mr. Danzuka was convicted of all three counts at the conclusion of the second trial.  Mr.

Danzuka appealed his convictions, and we affirmed.  Mr. Danzuka timely brings this

PRP.

LAW ENFORCEMENT INTERVIEW OF J.G.

Before the first trial, J.G. was interviewed by Detective Randy Grant of the Chelan

County Sherriff's Office.  Regarding the alleged abuse, Detective Grant asked J.G.

whether there was "a specific incident that sticks out in [her] mind."  PRP App. B at 27.

Detective Grant then instructed J.G.:

> what I'd like you to do, is I want you to take one of those times, you know,
> you pick, ok, I'm gonna put you in charge of choosing and then maybe
> we'll talk about the others but, if you could pick that time and then um
> describe to me what happened and then I may have some questions for you.

PRP App. B at 27 (some capitalization and emphasis omitted).  J.G. then described an

event that occurred on Christmas Eve when she was 10 years old.  J.G. claimed Mr.

Danzuka had returned home from working in North Dakota, took her for a drive in the

middle of the night, and forced her to have intercourse in his truck.  When asked whether

2

this was the first time something like that had happened, J.G. stated, "[I]t happened before that." PRP App. B at 35 (some capitalization and emphasis omitted). Detective Grant asked J.G. if she remembered the first time something happened with Mr. Danzuka. J.G. responded, "A lot of it was just like the tickling stuff that he did or just picking me up from behind," and "[Mr. Danzuka] liked to do anything he could, every night." PRP App. B at 38, 43 (some capitalization and emphasis omitted).

Detective Grant attempted to clarify when the abuse occurred:

[DETECTIVE GRANT]: So [J.G.] here's what I want to clarify because uh and I may be just, it may just be me getting confused on this a little bit, so I want to make sure I understand though. The first time, the Christmas one, you were ten years old, right?

[J.G.]: (Nodding)

[DETECTIVE GRANT]: And then we go through to July of the, was it July of the next year?

[J.G.]: No it was the same, well, I guess it was the, yeah, the next year because it goes Christmas and New Years, but it was still, I was still ten.
. . . .

[DETECTIVE GRANT]: And then after you turned ten, did he continue to do things you didn't want him to do?

[J.G.]: (Nodding).

[DETECTIVE GRANT]: Ok. And, so here's, because you had to started to menstruate, correct?

[J.G.]: When I was thirteen.

[DETECTIVE GRANT]: Ok, so now, there's where I'm confused. Ok? So, the first event happens on that Christmas Eve and Christmas Day.

3

[J.G.]: Yeah.

[DETECTIVE GRANT]: And then

[J.G.]: The last one is in July, but he always did stuff.  He was

[DETECTIVE GRANT]: In-between?

[J.G.]: Yeah.

. . . .

[J.G.]: The last time was when I was thirteen.

[DETECTIVE GRANT]: And was that the, the, near the 4th of July time?

[J.G.]: Yeah.

PRP App. B at 43-44 (some capitalization and emphasis omitted).

DEFENSE INTERVIEW OF J.G.

J.G. was later interviewed by an investigator from the Chelan County Public Defender Association.  Mr. Danzuka's trial attorney was present for the interview.  During the interview, J.G. stated the abuse occurred in the truck or in her bedroom and began when she was 10 years old and attending the fourth grade.  J.G. reported the first incident occurred in her bedroom in September, not long after school started.  J.G. admitted she was uncertain how many times she was abused by Mr. Danzuka, but the abuse ended when she was almost 13.  J.G. confirmed she was in the fourth or fifth grade when the Christmas Eve assault occurred in Mr. Danzuka's truck.

FIRST TRIAL

During the first trial, held in July 2021, J.G. testified that Mr. Danzuka began acting inappropriately toward her a few months after he moved into her family's home. J.G. testified that Mr. Danzuka would force her to have intercourse with him in his truck. When asked how old she was the first time that something happened in Mr. Danzuka's truck, J.G. responded, "I think ten; nine or ten." PRP App. D at 219. J.G. recounted the Christmas Eve incident that occurred when Mr. Danzuka returned from North Dakota and took her on a drive. J.G. testified there were other occasions when Mr. Danzuka sexually abused her in his truck after the Christmas Eve incident.

J.G. also testified that Mr. Danzuka would also abuse her in the bedrooms of the various residences they lived in while he was dating her mother. J.G. specifically described an incident that occurred when she was approximately 9 or 10 years old in the "Hughes Street house." PRP App. D at 229. J.G. stated Mr. Danzuka forced her to have intercourse "[m]ore than one time" at the "Hughes Street house." PRP App. D at 231. J.G. testified the abuse ended when they resided at the house "on Blewett" when she was 13 years old. PRP App. D at 244.

On cross-examination, J.G. affirmed that the "first time that Mr. Danzuka raped [her], was around Christmastime, in his truck." PRP App. D at 258-59. J.G. was then asked about statements she made during the defense interview:

> [DEFENSE COUNSEL]: Okay. Do you remember telling us that the first time that Mr. Danzuka raped you was actually about three months earlier?
>
> [J.G.]: I don't remember, off the top of my head.
>
> [DEFENSE COUNSEL]: And that it was after school?
>
> [J.G.]: I'm sorry. I really don't remember a lot about talking with everyone. I just tried to get it done.

PRP App. D at 265. After J.G. reviewed the transcript from the defense interview, defense counsel asked, "Can you please tell us when you reported, in that interview, when your first rape was[?]" PRP App. D at 273. J.G. responded, "Septemberish" after school. PRP App. D at 274. J.G. later testified that the abuse blurred together because "it happened so much, that it's kind of—just, like, I remember it happening. I just remember it happening." PRP App. D at 275.

The court ordered a mistrial after the jury became "deadlocked" during deliberations. PRP App. D at 500, 509.

SECOND TRIAL

A second jury trial commenced in April 2022. Mr. Danzuka was represented by the same attorney who represented him at the first trial and attended the defense interview of J.G. At the second trial, J.G. testified that Mr. Danzuka sexually abused her from when she was approximately 9 years old until she was 12 or 13 years old. J.G. testified the abuse began with Mr. Danzuka tickling her and putting his hand in her pants. J.G. confirmed she had the clearest memory of the abuse that occurred in Mr. Danzuka's truck

after he returned from North Dakota on Christmas Eve.  J.G. testified abuse "beyond the tickling" happened prior to the Christmas Eve incident, but the Christmas Eve incident "is, like, the one that, like sticks in [her] head the most."   Rep. of Proc. (RP) at 547.  J.G. testified the abuse that occurred in various places they resided, including the "Hughes Street" house, "the apartments," and the "Blewitt [house]" but the assault in her bedroom at the "Hughes Street house" stood out to her more than other events.  RP at 551, 554. J.G. acknowledged that these instances would "blur together," but the abuse ended when she was "[l]ike, twelve" and had started menstruating.  RP at 553-55.

On cross-examination, J.G. confirmed that everything she had stated to Detective Grant was correct.  Defense counsel then inquired:

> [DEFENSE COUNSEL]: And there were three incidents that you told [Detective Grant] about; correct?
>
> [J.G.]: I don't remember off the top of my head.
>
> [DEFENSE COUNSEL]: Okay. Do remember telling him that the first time was Christmas Eve?
>
> [J.G.]: The first time that I remember really clearly, yeah.
>
> [DEFENSE COUNSEL]: Do you remember telling him that the last time, the time when you were menstruating, was around the 4th of July?
>
> [J.G.]: I don't remember a lot of my—a lot about talking to people, but I do remember talking to him.
> . . . .
>
> [DEFENSE COUNSEL]: Do you remember telling [Detective Grant] that you said that the abuse started at the Hughes Street address?

[J.G.]: Yes.

[DEFENSE COUNSEL]: And then today, you said it started with tickling.

[J.G.]: Uh-huh.

[DEFENSE COUNSEL]: And you said that the first time you—or the first incident that you recalled was Christmas Eve.

[J.G.]: Yes.

[DEFENSE COUNSEL]: And that took place in his truck.

[J.G.]: Yes.

RP at 562, 569. Defense counsel then questioned J.G. about the defense interview:

[DEFENSE COUNSEL]: Do you remember during that conversation you had told us that actually the first time that Mr. Danzuka had raped you was after school about three months earlier?

[J.G.]: I remember talking about it.

[DEFENSE COUNSEL]: Okay. And that was in your bedroom?

[J.G.]: Yes.

RP at 575-76.

On redirect examination, the State provided J.G. with a transcript from her interview with Detective Grant. The State then inquired:

[THE STATE]: [J.G.], on that transcript, are you ever directly telling Detective Grant that the incident after [Mr. Danzuka] got back from North Dakota was the first time?

[J.G.]: No.

[THE STATE]: In fact, he's asking you to tell him about a time that stands out the most to you, is he not?

[J.G.]: Yes.

[THE STATE]: Thank you. And as you testified here today, that's the time that stands out the most to you?

[J.G.]: Yes.

[THE STATE]: But it wasn't the first time.

[J.G.]: No.

RP at 579.

On re-cross-examination, defense counsel asked:

[DEFENSE COUNSEL]: Okay. Did Detective Grant from this have the impression that the first time was Christmas Eve?

[J.G.]: I don't think so. He asked me to tell him something that was—something that really stuck out in my head, to tell him about something I remembered the most.

[DEFENSE COUNSEL]: So you're saying that you didn't respond to him when he asked if the first time is the Christmas Eve one when you were ten years old? Would you like to review this again?

[J.G.]: Sure. I thought I was eleven.

[DEFENSE COUNSEL]: So that Christmas Eve, you were eleven?

[J.G.]: I would have been ten because I said "Almost eleven."

[DEFENSE COUNSEL]: Did you indicate to Detective Grant that the first time was Christmas Eve?

9

> [J.G.]: Well, it was the first time I was talking about with him because I had talked to him about a couple of them, and he referred to it as "the Christmas one," the first one that I was telling him about.

RP at 583.

Detective Grant described J.G.'s demeanor during his interview as scared, upset, crying, and "struggling to communicate." RP at 667. Detective Grant stated that it can be difficult for a person to communicate when they are struggling and "wires get crossed" when recounting the chronology of events. RP at 671. In Detective Grant's experience, a miscommunication about the chronology of events does not impact the details that are given about the events. Detective Grant stated he asked J.G. to tell him about "one specific incident that she remembered best" about the abuse during the interview. RP at 669. Detective Grant recalled J.G.'s first claim of abuse occurred when Mr. Danzuka returned home from North Dakota.

Mr. Danzuka testified that he never penetrated, raped, or touched J.G. in a sexual way. He stated he returned home by train on Christmas Eve, leaving his Ford truck in North Dakota. Mr. Danzuka stated he did not own the truck J.G. described until February 2012.

During summation, defense counsel highlighted the inconsistencies between J.G.'s testimony and statements she made during the interviews. Defense counsel pointed out that J.G. told Detective Grant that the Christmas Eve assault was the first time abuse had occurred but then claimed during the defense interview that Mr. Danzuka had abused her

months earlier in her bedroom. Defense counsel also argued that Mr. Danzuka did not have the truck J.G. described on Christmas Eve and his Ford truck was left in North Dakota.

The jury found Mr. Danzuka guilty of all three counts at the conclusion of the trial, and he was later sentenced. Mr. Danzuka's convictions were affirmed on direct appeal.[2] Mr. Danzuka now timely brings this PRP.

## ANALYSIS

Mr. Danzuka contends his trial attorney was deficient in failing to effectively cross-examine J.G. and impeach her with her prior inconsistent statements. We disagree.

Obtaining relief through a collateral attack on a conviction is extraordinary and necessitates overcoming a high standard. *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). In a PRP, the petitioner is required to show that there was constitutional error that actually and substantially prejudiced them or that they suffered a nonconstitutional fundamental defect at trial "that inherently resulted in a complete miscarriage of justice." *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013). "To show actual and substantial prejudice, a petitioner must show that the outcome would more likely than not have been different had the alleged error not occurred." *In re Pers. Restraint of Davis*, 200 Wn.2d 75, 86, 514 P.3d 653 (2022).

---

[2] *Danzuka*, No. 38982-1-III.

Defendants have a constitutionally guaranteed right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). We review ineffective assistance of counsel claims de novo. *State v. White*, 80 Wn. App. 406, 410, 907 P.2d 310 (1995).

To succeed on a claim of ineffective assistance of counsel, the petitioner bears the burden of showing (1) that their attorney's performance fell below an objective standard of reasonableness based on consideration of all the circumstances and, if so, (2) that there is a reasonable probability that but for their attorney's poor performance, the outcome of the proceedings would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If either element is not satisfied, the inquiry ends. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). In reviewing the record, there is a strong presumption that counsel's performance was reasonable. *McFarland*, 127 Wn.2d at 335. "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). When counsel's conduct can be characterized as a legitimate trial strategy or tactic, their performance is not deficient. *Kyllo*, 166 Wn.2d at 863.

Even if we find that counsel's performance was deficient, a defendant must affirmatively prove prejudice. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). This requires more than simply showing that "the errors had some conceivable

12

effect on the outcome." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A defendant demonstrates prejudice by showing that the proceedings would have been different but for counsel's deficient representation. *McFarland*, 127 Wn.2d at 337.

When it comes to ineffective assistance of counsel claims based on trial counsel's poor cross-examination, our Supreme Court has held that "even a lame cross-examination will seldom, if ever, amount to a Sixth Amendment violation." *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 489, 965 P.2d 593 (1998). This is because "[c]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 720, 101 P.3d 1 (2004).

Mr. Danzuka argues his trial attorney was deficient in failing to effectively cross-examine J.G. about the chronology of abuse and impeach her with prior inconsistent statements. In support of his claim, Mr. Danzuka points us to the differences in defense counsel's performance between the first trial and the second trial. During the first trial, J.G. testified that Mr. Danzuka first sexually abused her on Christmas Eve. After presenting J.G. with a transcript from the defense interview, J.G. acknowledged she had previously claimed Mr. Danzuka first sexually abused her months before the Christmas Eve incident.

During the second trial, J.G. testified the abuse first occurred in her bedroom months before the Christmas Eve event. On cross-examination, defense counsel asked J.G. if she remembered telling Detective Grant the abuse began on Christmas Eve. J.G. responded that was "[t]he first time that I remember really clearly, yeah." RP at 562. Defense counsel did not question J.G. about her testimony from the first trial nor attempt to impeach her with statements she made during the defense interview.

DEFENSE COUNSEL'S PERFORMANCE

Defense counsel's decision to forgo cross-examining J.G. about her prior statements was a legitimate trial strategy or tactic. J.G. admitted her memories were blurred. Consequently, an aggressive cross-examination of a potentially sympathetic victim may have yielded little benefit and likely could have presented the defense as callous. This is especially true where, as here, J.G. was consistently unclear about when the abuse began and, admittedly, recalled certain events better than others. Moreover, an extensive cross-examination about when the abuse began may have resulted in testimony of additional abuse or presented clearer testimony about the incidents of abuse that had already been presented, both of which would have been prejudicial to Mr. Danzuka.

Notably, Mr. Danzuka's attorney was present at the defense interview of J.G., possessed the transcript from Detective Grant's interview of J.G., and represented Mr. Danzuka at the first trial. Defense counsel was clearly aware of J.G.'s inconsistent statements, as reflected in her cross-examination of J.G. at both trials, and elected an

14

alternate strategy at the second trial. Such decisions are within the professional discretion of trial counsel.

In reviewing the record with a strong presumption that defense counsel's performance was reasonable, Mr. Danzuka has failed to establish that his attorney's cross-examination of J.G. fell below an objective standard of reasonableness.

PREJUDICE

Mr. Danzuka argues he was prejudiced because his attorney's lack of an effective cross-examination presented J.G. as highly credible and allowed the jury to adopt the State's theory of the case. Even if we were to conclude that defense counsel's cross-examination of J.G. constituted deficient performance, Mr. Danzuka cannot demonstrate prejudice.

J.G.'s testimony was presented 12 years after the abuse began. J.G. testified that the abuse began when she was 10 years old, spanned 3 years, and occurred in multiple residences and in Mr. Danzuka's vehicle. She admitted that her memories of abuse were blurred and that she recalled certain events clearer than others. Detective Grant testified that when a person is struggling, as J.G. was described, it can be difficult to communicate and the person may get their "wires . . . crossed" when it comes to the chronology of events. RP at 671. Based on Detective Grant's training and experience, a miscommunication about the chronology of incidents does not impact the details that are

15

given about the event. Moreover, many of J.G.'s statements about when the abuse began were made in response to unclear questions.

Mr. Danzuka has failed to show that the outcome of the trial would more likely than not have been different had his attorney more thoroughly cross-examined J.G. and impeached her with her prior statements.

Accordingly, we deny Mr. Danzuka's petition.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Cooney, A.C.J.

WE CONCUR:

Murphy, J.

Hill, J.